# ARKANSAS BEST CORP. *v.* COMMISSIONER OF INTERNAL REVENUE

No. 86–751.   Argued December 9, 1987—Decided March 7, 1988

MARSHALL, J., delivered the opinion of the Court, in which all other Members joined, except KENNEDY, J., who took no part in the consideration or decision of the case.

*Vester T. Hughes, Jr.,* argued the cause for petitioner. With him on the briefs were *David Bryant* and *Stephen D. Good.*

*Alan I. Horowitz* argued the cause for respondent. With him on the brief were *Solicitor General Fried, Acting Assistant Attorney General Durney, Deputy Solicitor General Lauber,* and *Michael L. Paup.**

JUSTICE MARSHALL delivered the opinion of the Court.

The issue presented in this case is whether capital stock held by petitioner Arkansas Best Corporation (Arkansas Best) is a "capital asset" as defined in § 1221 of the Internal Revenue Code regardless of whether the stock was purchased and held for a business purpose or for an investment purpose.

I

Arkansas Best is a diversified holding company. In 1968 it acquired approximately 65% of the stock of the National

---

**Thomas Smidt II, Charles L. Saunders, Jr.,* and *A. Jerry Busby* filed a brief for Circle K Corp. as *amicus curiae* urging reversal.

Briefs of *amici curiae* were filed for Kraft, Inc., by *Don S. Harnack, James L. Malone III, Richard A. Hanson,* and *Thomas J. McHugh;* and for the National Council of Farmer Cooperatives by *Arthur E. Bryan, Jr., George W. Benson,* and *James S. Krzyminski.*

Bank of Commerce (Bank) in Dallas, Texas. Between 1969 and 1974, Arkansas Best more than tripled the number of shares it owned in the Bank, although its percentage interest in the Bank remained relatively stable. These acquisitions were prompted principally by the Bank's need for added capital. Until 1972, the Bank appeared to be prosperous and growing, and the added capital was necessary to accommodate this growth. As the Dallas real estate market declined, however, so too did the financial health of the Bank, which had a heavy concentration of loans in the local real estate industry. In 1972, federal examiners classified the Bank as a problem bank. The infusion of capital after 1972 was prompted by the loan portfolio problems of the bank.

Petitioner sold the bulk of its Bank stock on June 30, 1975, leaving it with only a 14.7% stake in the Bank. On its federal income tax return for 1975, petitioner claimed a deduction for an ordinary loss of $9,995,688 resulting from the sale of the stock. The Commissioner of Internal Revenue disallowed the deduction, finding that the loss from the sale of stock was a capital loss, rather than an ordinary loss, and that it therefore was subject to the capital loss limitations in the Internal Revenue Code.[1]

Arkansas Best challenged the Commissioner's determination in the United States Tax Court. The Tax Court, relying on cases interpreting *Corn Products Refining Co.* v. *Commissioner*, 350 U. S. 46 (1955), held that stock purchased with a substantial investment purpose is a capital asset which, when sold, gives rise to a capital gain or loss, whereas stock purchased and held for a business purpose, without any substantial investment motive, is an ordinary asset whose sale gives rise to ordinary gains or losses. See 83 T. C. 640,

---

[1] Title 26 U. S. C. § 1211(a) states that "[i]n the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges." Section 1212(a) establishes rules governing carrybacks and carryovers of capital losses, permitting such losses to offset capital gains in certain earlier or later years.

653–654 (1984). The court characterized Arkansas Best's acquisitions through 1972 as occurring during the Bank's "'growth' phase," and found that these acquisitions "were motivated primarily by investment purpose and only incidentally by some business purpose." *Id.*, at 654. The stock acquired during this period therefore constituted a capital asset, which gave rise to a capital loss when sold in 1975. The court determined, however, that the acquisitions after 1972 occurred during the Bank's "'problem' phase," *ibid.*, and, except for certain minor exceptions, "were made exclusively for business purposes and subsequently held for the same reasons." *Id.*, at 656. These acquisitions, the court found, were designed to preserve petitioner's business reputation, because without the added capital the Bank probably would have failed. *Id.*, at 656–657. The loss realized on the sale of this stock was thus held to be an ordinary loss.

The Court of Appeals for the Eighth Circuit reversed the Tax Court's determination that the loss realized on stock purchased after 1972 was subject to ordinary-loss treatment, holding that all of the Bank stock sold in 1975 was subject to capital-loss treatment. 800 F. 2d 215 (1986). The court reasoned that the Bank stock clearly fell within the general definition of "capital asset" in Internal Revenue Code § 1221, and that the stock did not fall within any of the specific statutory exceptions to this definition. The court concluded that Arkansas Best's purpose in acquiring and holding the stock was irrelevant to the determination whether the stock was a capital asset. We granted certiorari, 480 U. S. 930, and now affirm.

## II

Section 1221 of the Internal Revenue Code defines "capital asset" broadly as "property held by the taxpayer (whether or not connected with his trade or business)," and then excludes five specific classes of property from capital-asset

status. In the statute's present form,[2] the classes of property exempted from the broad definition are (1) "property of a kind which would properly be included in the inventory of the taxpayer"; (2) real property or other depreciable property used in the taxpayer's trade or business; (3) "a copyright, a literary, musical, or artistic composition," or similar property; (4) "accounts or notes receivable acquired in the ordinary course of trade or business for services rendered" or from the sale of inventory; and (5) publications of the Federal Government. Arkansas Best acknowledges that the Bank stock falls within the literal definition of "capital asset" in § 1221, and is outside of the statutory exclusions. It asserts, however, that this determination does not end the inquiry. Petitioner argues that in *Corn Products Refining Co.* v. *Commissioner, supra,* this Court rejected a literal reading of § 1221, and concluded that assets acquired and sold for ordinary business purposes rather than for investment purposes should be given ordinary-asset treatment. Petitioner's reading of *Corn Products* finds much support in the academic literature[3] and in the courts.[4] Unfortunately for petitioner, this broad reading finds no support in the language of § 1221.

---

[2] In 1975, when petitioner sold its Bank stock, § 1221 contained a different exception (5), which excluded certain federal and state debt obligations. See 26 U. S. C. § 1221(5) (1970 ed.). That exception was repealed by the Economic Recovery Tax Act of 1981, Pub. L. 97–34, § 505(a), 95 Stat. 331. The present exception (5) was added by the Tax Reform Act of 1976, Pub. L. 94–455, § 2132(a), 90 Stat. 1925. These changes have no bearing on this case.

[3] See, *e. g.*, 2 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 51.10.3, p. 51–62 (1981); Chirelstein, Capital Gain and the Sale of a Business Opportunity: The Income Tax Treatment of Contract Termination Payments, 49 Minn. L. Rev. 1, 41 (1964); Troxell & Noall, Judicial Erosion of the Concept of Securities as Capital Assets, 19 Tax L. Rev. 185, 187 (1964); Note, The *Corn Products* Doctrine and Its Application to Partnership Interests, 79 Colum. L. Rev. 341, and n. 3 (1979).

[4] See, *e. g.*, *Campbell Taggart, Inc.* v. *United States*, 744 F. 2d 442, 456–458 (CA5 1984); *Steadman* v. *Commissioner*, 424 F. 2d 1, 5 (CA6), cert. denied, 400 U. S. 869 (1970); *Booth Newspapers, Inc.* v. *United*

In essence, petitioner argues that "property held by the taxpayer (whether or not connected with his trade or business)" does not include property that is acquired and held for a business purpose. In petitioner's view an asset's status as "property" thus turns on the motivation behind its acquisition. This motive test, however, is not only nowhere mentioned in § 1221, but it is also in direct conflict with the parenthetical phrase "whether or not connected with his trade or business." The broad definition of the term "capital asset" explicitly makes irrelevant any consideration of the property's connection with the taxpayer's business, whereas petitioner's rule would make this factor dispositive.[5]

In a related argument, petitioner contends that the five exceptions listed in § 1221 for certain kinds of property are illustrative, rather than exhaustive, and that courts are therefore free to fashion additional exceptions in order to further the general purposes of the capital-asset provisions. The language of the statute refutes petitioner's construction. Section 1221 provides that "capital asset" means "property held by the taxpayer[,] . . . but does not include" the five classes

---

*States*, 157 Ct. Cl. 886, 893–896, 303 F. 2d 916, 920–921 (1962); *W. W. Windle Co.* v. *Commissioner*, 65 T. C. 694, 707–713 (1976).

[5] Petitioner mistakenly relies on cases in which this Court, in narrowly applying the general definition of "capital asset," has "construed 'capital asset' to exclude property representing income items or accretions to the value of a capital asset themselves properly attributable to income," even though these items are property in the broad sense of the word. *United States* v. *Midland-Ross Corp.*, 381 U. S. 54, 57 (1965). See, *e. g., Commissioner* v. *Gillette Motor Co.*, 364 U. S. 130 (1960) ("capital asset" does not include compensation awarded taxpayer that represented fair rental value of its facilities); *Commissioner* v. *P. G. Lake, Inc.*, 356 U. S. 260 (1958) ("capital asset" does not include proceeds from sale of oil payment rights); *Hort* v. *Commissioner*, 313 U. S. 28 (1941) ("capital asset" does not include payment to lessor for cancellation of unexpired portion of a lease). This line of cases, based on the premise that § 1221 "property" does not include claims or rights to ordinary income, has no application in the present context. Petitioner sold capital stock, not a claim to ordinary income.

of property listed as exceptions. We believe this locution signifies that the listed exceptions are exclusive. The body of § 1221 establishes a general definition of the term "capital asset," and the phrase "does not include" takes out of that broad definition only the classes of property that are specifically mentioned. The legislative history of the capital-asset definition supports this interpretation, see H. R. Rep. No. 704, 73d Cong., 2d Sess., 31 (1934) ("[T]he definition includes all property, except as specifically excluded"); H. R. Rep. No. 1337, 83d Cong., 2d Sess., A273 (1954) ("[A] capital asset is property held by the taxpayer with certain exceptions"), as does the applicable Treasury regulation, see 26 CFR § 1.1221–1(a) (1987) ("The term 'capital assets' includes all classes of property not specifically excluded by section 1221").

Petitioner's reading of the statute is also in tension with the exceptions listed in § 1221. These exclusions would be largely superfluous if assets acquired primarily or exclusively for business purposes were not capital assets. Inventory, real or depreciable property used in the taxpayer's trade or business, and accounts or notes receivable acquired in the ordinary course of business, would undoubtedly satisfy such a business-motive test. Yet these exceptions were created by Congress in separate enactments spanning 30 years.[6] Without any express direction from Congress, we are unwilling to read § 1221 in a manner that makes surplusage of these statutory exclusions.

---

[6] The inventory exception was part of the original enactment of the capital-asset provision in 1924. See Revenue Act of 1924, ch. 234, § 208(a)(8), 43 Stat. 263. Depreciable property used in a trade or business was excluded in 1938, see Revenue Act of 1938, ch. 289, § 117(a)(1), 52 Stat. 500, and real property used in a trade or business was excluded in 1942, see Revenue Act of 1942, ch. 619, § 151(a), 56 Stat. 846. The exception for accounts and notes receivable acquired in the ordinary course of trade or business was added in 1954. Internal Revenue Code of 1954, § 1221(4), 68A Stat. 322.

In the end, petitioner places all reliance on its reading of *Corn Products Refining Co.* v. *Commissioner*, 350 U. S. 46 (1955)—a reading we believe is too expansive. In *Corn Products*, the Court considered whether income arising from a taxpayer's dealings in corn futures was entitled to capital-gains treatment. The taxpayer was a company that converted corn into starches, sugars, and other products. After droughts in the 1930's caused sharp increases in corn prices, the company began a program of buying corn futures to assure itself an adequate supply of corn and protect against price increases. See *id.*, at 48. The company "would take delivery on such contracts as it found necessary to its manufacturing operations and sell the remainder in early summer if no shortage was imminent. If shortages appeared, however, it sold futures only as it bought spot corn for grinding." *Id.*, at 48–49. The Court characterized the company's dealing in corn futures as "hedging." *Id.*, at 51. As explained by the Court of Appeals in *Corn Products*, "[h]edging is a method of dealing in commodity futures whereby a person or business protects itself against price fluctuations at the time of delivery of the product which it sells or buys." 215 F. 2d 513, 515 (CA2 1954). In evaluating the company's claim that the sales of corn futures resulted in capital gains and losses, this Court stated:

> "Nor can we find support for petitioner's contention that hedging is not within the exclusions of [§ 1221]. Admittedly, petitioner's corn futures do not come within the literal language of the exclusions set out in that section. They were not stock in trade, actual inventory, property held for sale to customers or depreciable property used in a trade or business. But the capital-asset provision of [§ 1221] must not be so broadly applied as to defeat rather than further the purpose of Congress. Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss.

. . . Since this section is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly." 350 U. S., at 51–52 (citations omitted).

The Court went on to note that hedging transactions consistently had been considered to give rise to ordinary gains and losses, and then concluded that the corn futures were subject to ordinary-asset treatment. *Id.*, at 52–53.

The Court in *Corn Products* proffered the oft-quoted rule of construction that the definition of "capital asset" must be narrowly applied and its exclusions interpreted broadly, but it did not state explicitly whether the holding was based on a narrow reading of the phrase "property held by the taxpayer," or on a broad reading of the inventory exclusion of § 1221. In light of the stark language of § 1221, however, we believe that *Corn Products* is properly interpreted as involving an application of § 1221's inventory exception. Such a reading is consistent both with the Court's reasoning in that case and with § 1221. The Court stated in *Corn Products* that the company's futures transactions were "an integral part of its business designed to protect its manufacturing operations against a price increase in its principal raw material and to assure a ready supply for future manufacturing requirements." 350 U. S., at 50. The company bought, sold, and took delivery under the futures contracts as required by the company's manufacturing needs. As Professor Bittker notes, under these circumstances, the futures can "easily be viewed as surrogates for the raw material itself." 2 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 51.10.3, p. 51–62 (1981). The Court of Appeals for the Second Circuit in *Corn Products* clearly took this approach. That court stated that when commodity futures are "utilized solely for the purpose of stabilizing inventory cost[,] . . . [they] cannot reasonably be separated from the inventory items," and concluded that "property used in hedging trans-

actions properly comes within the exclusions of [§ 1221]." 215 F. 2d, at 516. This Court indicated its acceptance of the Second Circuit's reasoning when it began the central paragraph of its opinion: "Nor can we find support for petitioner's contention that hedging is not within the exclusions of [§ 1221]." 350 U. S., at 51. In the following paragraph, the Court argued that the Treasury had consistently viewed such hedging transactions as a form of insurance to stabilize the cost of inventory, and cited a Treasury ruling which concluded that the value of a manufacturer's raw-material inventory should be adjusted to take into account hedging transactions in futures contracts. See *id.*, at 52–53 (citing G. C. M. 17322, XV–2 Cum. Bull. 151 (1936)). This discussion, read in light of the Second Circuit's holding and the plain language of § 1221, convinces us that although the corn futures were not "actual inventory," their use as an integral part of the taxpayer's inventory-purchase system led the Court to treat them as substitutes for the corn inventory such that they came within a broad reading of "property of a kind which would properly be included in the inventory of the taxpayer" in § 1221.

Petitioner argues that by focusing attention on whether the asset was acquired and sold as an integral part of the taxpayer's everyday business operations, the Court in *Corn Products* intended to create a general exemption from capital-asset status for assets acquired for business purposes. We believe petitioner misunderstands the relevance of the Court's inquiry. A business connection, although irrelevant to the initial determination whether an item is a capital asset, is relevant in determining the applicability of certain of the statutory exceptions, including the inventory exception. The close connection between the futures transactions and the taxpayer's business in *Corn Products* was crucial to whether the corn futures could be considered surrogates for the stored inventory of raw corn. For if the futures dealings were not part of the company's inventory-purchase system,

and instead amounted simply to speculation in corn futures, they could not be considered substitutes for the company's corn inventory, and would fall outside even a broad reading of the inventory exclusion. We conclude that *Corn Products* is properly interpreted as standing for the narrow proposition that hedging transactions that are an integral part of a business' inventory-purchase system fall within the inventory exclusion of § 1221.[7] Arkansas Best, which is not a dealer in securities, has never suggested that the Bank stock falls within the inventory exclusion. *Corn Products* thus has no application to this case.

It is also important to note that the business-motive test advocated by petitioner is subject to the same kind of abuse that the Court condemned in *Corn Products*. The Court explained in *Corn Products* that unless hedging transactions were subject to ordinary gain and loss treatment, taxpayers engaged in such transactions could "transmute ordinary income into capital gain at will." 350 U. S., at 53–54. The hedger could garner capital-asset treatment by selling the future and purchasing the commodity on the spot market, or ordinary-asset treatment by taking delivery under the future contract. In a similar vein, if capital stock purchased and held for a business purpose is an ordinary asset, whereas the same stock purchased and held with an investment motive is a capital asset, a taxpayer such as Arkansas Best could have significant influence over whether the asset would receive capital or ordinary treatment. Because stock is most natu-

---

[7] Although congressional inaction is generally a poor measure of congressional intent, we are given some pause by the fact that over 25 years have passed since *Corn Products Refining Co.* v. *Commissioner* was initially interpreted as excluding assets acquired for business purposes from the definition of "capital asset," see *Booth Newspapers, Inc.* v. *United States*, 157 Ct. Cl. 886, 303 F. 2d 916 (1962), without any sign of disfavor from Congress. We cannot ignore the unambiguous language of § 1221, however, no matter how reticent Congress has been. If a broad exclusion from capital-asset status is to be created for assets acquired for business purposes, it must come from congressional action, not silence.

rally viewed as a capital asset, the Internal Revenue Service would be hard pressed to challenge a taxpayer's claim that stock was acquired as an investment, and that a gain arising from the sale of such stock was therefore a capital gain. Indeed, we are unaware of a single decision that has applied the business-motive test so as to require a taxpayer to report a gain from the sale of stock as an ordinary gain. If the same stock is sold at a loss, however, the taxpayer may be able to garner ordinary-loss treatment by emphasizing the business purpose behind the stock's acquisition. The potential for such abuse was evidenced in this case by the fact that as late as 1974, when Arkansas Best still hoped to sell the Bank stock at a profit, Arkansas Best apparently expected to report the gain as a capital gain. See 83 T. C., at 647–648.

## III

We conclude that a taxpayer's motivation in purchasing an asset is irrelevant to the question whether the asset is "property held by a taxpayer (whether or not connected with his business)" and is thus within § 1221's general definition of "capital asset." Because the capital stock held by petitioner falls within the broad definition of the term "capital asset" in § 1221 and is outside the classes of property excluded from capital-asset status, the loss arising from the sale of the stock is a capital loss. *Corn Products Refining Co.* v. *Commissioner, supra,* which we interpret as involving a broad reading of the inventory exclusion of § 1221, has no application in the present context. Accordingly, the judgment of the Court of Appeals is affirmed.

*It is so ordered.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.