**In re C.H. BUTCHER, Jr., Debtor.**

**In re Shirley R. BUTCHER, Debtor.**

**Bankruptcy Nos. 3–83–01008, 3–83–01401.**

United States Bankruptcy Court, E.D. Tennessee.

May 25, 1989.

Weinberger, Weinstock, Sagner, Stevan & Harris, P.A., Neal S. Melnick, Baltimore, Md., James R. Moore, Knoxville, Tenn., for James R. Martin, trustee.

John W. Gill, Jr., U.S. Atty., Marilyn L. Hudson, Asst. U.S. Atty., Knoxville, Tenn., Paul M. Predmore, Dept. of Justice, Washington, D.C., for U.S. and I.R.S.

## MEMORANDUM ON TRUSTEE'S OBJECTIONS TO CLAIMS OF INTERNAL REVENUE SERVICE

RICHARD S. STAIR, Jr., Bankruptcy Judge.

James R. Martin, Trustee of the estates of C.H. Butcher, Jr. (C.H.) and his wife, Shirley R. Butcher (Shirley), objects to proofs of claim filed by the Internal Revenue Service (IRS) as follows: Claim No. 30 filed October 3, 1983, in the C.H. case in the amount of $1,885,074.36; Claim No. 12 filed February 21, 1984, in the Shirley case in the amount of $1,928,985.48. Both claims represent alleged unpaid income tax-

es for the debtors' taxable years 1977, 1978, and 1979.[1]

The court is called upon to determine the following issues:[2]

(1) Whether the IRS incorrectly applied § 163(d) of the Internal Revenue Code[3] in disallowing interest expense and incorrectly classified income claimed on the debtors' individual income tax returns for the three years in dispute.

(2) Whether the IRS incorrectly determined that partnership losses from the following partnerships were investment losses rather than trade or business losses:

1977 tax year:

Knoxville Management Associates

Hamilton of Nashville Trust

Knoxville Housing Partnership

1978 & 1979 tax years:

Hamilton of Nashville Trust

Knoxville Housing Partnership

(3) If it is determined that C.H. is an investor and the Internal Revenue Service has correctly classified interest expense associated with loans utilized to acquire various bank stocks as investment interest, then whether, inconsistent with its application of Internal Revenue Code § 163(d), the IRS failed to classify credit life insurance commissions and other fees derived solely by reason of C.H.'s control of the financial institutions as investment income.

(4) Whether the claims of the IRS are entitled to priority status under 11 U.S.C.A. § 507(a)(7)(A) (West Supp.1989)[4] or are excluded from priority as "a tax of a kind specified in Section 523(a)(1)(B) or

---

**1.** Amended claims were filed by the IRS March 23, 1988, in the C.H. case and June 20, 1988, in the Shirley case in the amounts of $2,911,385.12 and $2,868,471.43, respectively. Each amended claim asserts additional liabilities for income taxes attributable to the debtors' 1980 and 1981 tax years. By stipulation the parties agree that the claims for 1980 and 1981 taxes will be allowed as tardily-filed claims pursuant to 11 U.S.C.A. § 726(a)(3) (West 1979).

**2.** A "Joint Pretrial Order" entered September 15, 1988, identifies seven issues for resolution by the court. One of these issues, whether amended claims filed by the IRS are time barred, was resolved in the manner discussed in n. 1, *supra*.

The second issue, relative to the Trustee's objection to the manner in which the IRS computed the debtors' 1979 investment tax credit and depreciation deduction, was withdrawn by the Trustee prior to trial.

**3.** 26 U.S.C.A. § 163(d) (West 1978).

**4.** Under the *Bankruptcy Amendments and Federal Judgeship Act of 1984*, Pub.L. 98–353, Title III, § 350(2), July 10, 1984, 98 Stat. 358, Subsection (a)(6) of Section 507 of title 11 was redesignated (a)(7). Although the C.H. and Shirley cases predate the 1984 Amendments, the court will cite the statute as currently enacted.

523(a)(1)(C) of [title 11]."[5] *See* 11 U.S.C.A. § 507(a)(7)(A)(iii) (West Supp.1989).

(5) Whether Shirley was an "innocent spouse" under § 6013(e) of the Internal Revenue Code thus relieving her estate of liability from the claim of the IRS.[6]

A hearing on the Trustee's objections was held October 13, 1988. In its consideration of the issues the court relies upon the "Joint Pretrial Order" entered September 15, 1988, "Stipulated Facts" filed by the parties on October 6, 1988, testimony of witnesses, exhibits, and deposition testimony of C.H., Shirley, and William Mayhew.[7]

This is a core proceeding. 28 U.S.C.A. § 157(b)(2)(B) (West Supp.1989).

## I

After graduating from Lincoln Memorial University in 1961, C.H. became a teller at Union County Bank in Maynardville, Tennessee. By 1964 he had acquired a controlling interest in Union County Bank and became its chairman of the board. Between 1964 and 1983 C.H. acquired an ownership interest in and operated twenty-one banks in Tennessee and Kentucky. C.H. purchased bank stock with a goal of making money from appreciation in the value of the stock.

The amount of stock C.H. personally acquired in a bank he sought to "control" was governed by the circumstances surrounding the individual bank.[8] If C.H. was acquiring a bank in an area where he had "connections," he might acquire ten (10%) percent of the stock himself while his friends purchased the balance. If he had minimal "connections," he might purchase the entire controlling stock interest himself. C.H. purchased stock in his various banks almost entirely with borrowed funds.

If C.H. had to acquire more stock in a particular bank than he desired to own himself, he would eventually reduce his ownership by selling some of his stock. He wanted to keep his ownership interest in the banks at a level where his income from the banks, through salaries, director's fees, dividends, credit life insurance commissions and the like, would be sufficient to pay the interest expense on the loans taken to acquire the stock. C.H.'s ultimate plan was to acquire an ownership interest in, and "control," a network of smaller banks, and then sell the entire block of banks to a "major company."[9] He believed that he could command a greater price for his bank stocks if they were sold as a whole rather than individually.

After acquiring a controlling stock interest in a bank, either individually or with the help of friends, C.H. would place himself on the board of directors and thereafter install people loyal to him in management positions. If C.H. persuaded friends to acquire stock, he would ask them to purchase the stock as an investment. None of C.H.'s friends who purchased stock were involved in the management of the bank being acquired. C.H. considered his "control" of a bank to be exercised in his capacity as a director of the bank rather than through his ownership of the stock in the bank.[10] There were, in fact, three or four banks "controlled" by C.H. in which he had no direct ownership interest and there were some banks he "controlled" in which he owned less than ten (10%) percent of the issued stock.

---

5. Upon request of the parties, determination of the priority issue will be deferred pending resolution of a motion filed by the Trustee pursuant to Fed.R.Crim.P. 6(e) in the United States District Court for the Eastern District of Tennessee seeking to inspect and copy certain grand jury records.

6. *See* n. 17, *infra.*

7. These three depositions were filed at the hearing. The parties designated those portions of each deposition relied upon in support of their respective theories.

8. *See* n. 10, *infra.*

9. *See* n. 10, *infra.*

10. C.H.'s "control" over a bank did not equate to stock ownership. Testimony elicited at the October 13, 1988 hearing is that C.H. would "control" a bank through his establishment of policies; directions to employees on the issuance of loans; hiring and promotions; service as a director and/or chairman of the board; or by instructions to employees in the manner in which they were to perform their jobs.

During the years 1977 through 1979, C.H. devoted approximately ninety to ninety-five (90–95%) percent of his time to banking activities. Approximately eighty (80%) percent of this time was spent on operating functions such as reviewing and approving bank loans, attending director's meetings, meeting with bank personnel to coordinate their activities, and attending social functions related to the banking industry. The remaining portion of time C.H. devoted to his banking activities was spent acquiring new banks.

In the years 1977 through 1979, C.H. received a salary, director's fees, appraisal fees, dividends, and credit life, credit disability and accident insurance commissions from each of the banks in which he had an ownership interest. Each of these items was reported as income from a trade or business on Schedule C–*Profit or (Loss) From Business Or Profession* to the debtors' Form 1040 joint U.S. Individual Income Tax Returns for 1977, 1978, and 1979. C.H. also realized gains and losses from the sale of some of his bank stocks in 1977, 1978, and 1979. These items were reported as capital items on Schedule D–*Capital Gains and Losses* to the debtors' joint income tax returns for the three years in question.

Of the total interest expense claimed on Schedule C to the debtors' joint 1977 income tax return, $1,015,763.70 is attributable to interest incurred on money borrowed to acquire bank stocks. The interest expense claimed by the debtors on Schedule C to their joint 1978 tax return for interest incurred on money borrowed to acquire bank stocks amounts to $1,217,136.01. In 1979, $1,416,210.63 of the interest expense claimed by the debtors on their joint 1979 income tax return represents interest incurred on money borrowed to acquire bank stocks. All interest expense claimed by the debtors during these three years was actually paid during the year in which it was reported.

In 1977 and 1978, C.H. had a seventy-five (75%) percent ownership interest in Hamilton of Nashville Trust, a partnership. This partnership owned stock in Hamilton Bank of Nashville. The partnership had interest expense incidental to the ownership of this bank stock which was passed through to C.H. in the form of a partnership loss. The debtors reported their interest expense and Hamilton of Nashville Trust partnership losses on Schedule C of their joint income tax returns for the years in question as trade or business expenses.

The IRS audited the debtors' tax returns for 1977, 1978, and 1979 and disagreed with the debtors' reporting of C.H.'s salaries, director's fees, dividends, appraisal fees, insurance commissions, and interest expenses attributable to the acquisition of bank stocks on Schedule C as income or expenses arising from the operation of a trade or business. All interest expense reported on Schedule C to the debtors' joint income tax returns for the three years in dispute, including the interest incurred in the acquisition of C.H.'s bank stocks, were recharacterized by the IRS as investment interest under § 163(d) of the Internal Revenue Code. In computing the debtors' investment interest deduction for 1977, 1978, and 1979, the IRS treated as investment income all interest income, dividend income, and all short-term capital gains reported by the debtors on their income tax returns for the three years in dispute. The IRS did not determine that the debtors had omitted any items of income from their 1977, 1978, and 1979 returns. No fraud penalties were assessed for any of these years.

On June 24, 1983, an involuntary petition was filed under Chapter 7 of title 11 of the United States Code against C.H. The order for relief was entered July 15, 1983. On September 7, 1983, an involuntary petition was filed under Chapter 7 of title 11 of the United States Code against Shirley. The order for relief was entered September 7, 1983. James R. Martin was appointed trustee of both debtors' estates. The Trustee filed his objection to the IRS claim in the C.H. estate on April 7, 1988: his objection in the Shirley case was filed July 2, 1987.

## II

As an initial matter, the Trustee and IRS dispute their respective burdens of proof.

The IRS contends that the burden on the Trustee is virtually identical with that of a petitioning taxpayer before the United States Tax Court, i.e., that the Trustee must demonstrate by a preponderance of the evidence that the IRS's determination is in error. The Trustee contends that under the Bankruptcy Code a claim of the IRS is prima facie evidence of the validity and amount of that claim; that the Trustee's burden is to rebut the prima facie evidence of the claim; and that if the Trustee meets his burden, the IRS must establish the claim's validity.

Bankruptcy Rule 3001 provides in material part:

(f) **Evidentiary Effect.** A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim.

Fed. R. Bankr. P. 3001.

The rule relative to burden of proof is stated in *In re Hudson Oil Co., Inc.*, 91 B.R. 932 (Bankr.D.Kan.1988) as follows:

Outside bankruptcy, the burden of proof with respect to a claimed deduction is normally on the taxpayer.

However, in the bankruptcy context, questions of burden of proof on claims or objections to claims, including tax claims, are governed by the Bankruptcy Code and Rules. A creditor's (IRS) proper filing of a proof of claim constitutes prima facie evidence of the validity and amount of the claim pursuant to section 502(a) and Rule 3001(f). Upon filing of an objection, the trustee is then called to produce evidence and show facts tending to defeat the claim. If the trustee succeeds in overcoming the prima facie effect of the proof of claim, then the burden remains on the creditor to prove the validity of the claim.

*Id.* at 945 (citations omitted).

The Fifth Circuit recently noted:

Although [the] principle [that the burden of proof rests upon the taxpayer] may hold true as a general tenet, an exception plainly exists under the Bankruptcy Code. Under Bankruptcy Rule [3001(f)], a party correctly filing a proof of claim is deemed to have established a prima facie case against the debtor's assets. The objecting party must then produce evidence rebutting the claimant [sic] or else the claimant will prevail. If, however, evidence rebutting the claim is brought forth, then the claimant must produce additional evidence to "prove the validity of the claim by a preponderance of the evidence." The ultimate burden of proof always rests upon the claimant. *This burden does not shift even where the claimant is a state or federal tax authority. The Bankruptcy Code, under Rule [3001(f)], does not differentiate between government and private claimants when proofs of claim are filed.*

*California State Board of Equalization v. Official Unsecured Creditors Committee (In the Matter of Fidelity Holding Co. Ltd.)*, 837 F.2d 696, 698 (5th Cir.1988) (citations omitted and emphasis added).

 In the instant proceeding, the proofs of claim filed by the IRS constitute prima facie evidence of the validity and amount of those claims. The burden shifts to the Trustee. Should he successfully meet his burden, then, as is noted by the Fifth Circuit, it will fall upon the IRS " 'to prove the validity of its claim[s].' " *Matter of Fidelity Holding Co. Ltd.*, 837 F.2d at 698.

For reasons hereafter discussed, the court has determined that the Trustee has not produced evidence and shown facts sufficient to overcome the prima facie effect of the IRS claims.

### III

The determination upon which much of this controversy revolves concerns the characterization to be applied to interest expense and partnership losses claimed by the debtors: Are these items properly characterized by the debtors on their joint returns as arising out of C.H.'s trade or business or, as is argued by the IRS, a result of investments?

The Trustee contends that because C.H. was actively involved in the operation of the banks in which he owned stock, he was

in the trade or business of banking. The parties stipulate that C.H. acquired controlling interest in numerous banks and financial institutions through stock purchased with his own funds; through stock purchased with funds of entities controlled by C.H.; or through stock purchased by C.H.'s friends. It is also stipulated that upon acquiring a controlling interest, C.H. would install his own personnel, set policy, hire, fire and control executive personnel, personally approve out of territory loans, consult with individual banks on problems and attend Directors and Executive Committee Meetings. C.H. also required that all credit life insurance policies issued by the banks and financial institutions he controlled be written through insurance companies for which he was an agent.

An exhibit to Schedule C to each of the debtors' joint income tax returns for 1977, 1978 and 1979 contains the following statement:

> *Schedule C, Line A—Principal Business Activities; Product:*
>
> Taxpayer engages in the trade or business of bank and insurance ownership and management and consulting activities relating thereto including, by way of illustration and not by way of limitation, the following: arrangement of loan participations; advice and counsel regarding policy and operations with respect to financial analysis, insurance, data processing, employee compensation and benefit programs, personnel recruitment and record keeping; and arrangement for capital infusions.
>
> The above-referenced services are provided directly by taxpayer or indirectly by Bankers' Service Group, Inc., ... an affiliate of taxpayer.

As a consequence of this statement, the Trustee contends C.H. was in the business of banking. Therefore, the Trustee argues that the interest the debtors paid on loans utilized to purchase bank stock should not be subject to the deduction restrictions im-

11. References to sections of the Internal Revenue Code will hereafter be prefaced exclusively

posed upon taxpayers under Internal Revenue Code § 163(d).[11]

Although the IRS agrees that between 1961 and 1983 C.H. was actively involved in the banking industry and was by profession principally a banker, it argues that C.H. was an investor and was not engaged in the business of banking. Therefore, it contends deductions taken for interest expenses are subject to the limitation set forth in I.R.C. § 163(d).

### ISSUE NO. (1)

#### Application of IRC § 163(d)

I.R.C. § 163(d) provides in material part:

(d) **Limitation on interest on investment indebtedness.—**

(1) **In general.**—In the case of a taxpayer other than a corporation, the amount of investment interest (as defined in paragraph (3)(D)) otherwise allowable as a deduction under this chapter shall be limited, in the following order, to—

(A) $10,000 ($5,000, in the case of a separate return by a married individual), plus

(B) the amount of the net investment income (as defined in paragraph (3)(A)), plus the amount (if any) by which the deductions allowable under this section (determined without regard to this subsection) and sections 162, 164(a)(1) or (2), or 212 attributable to property of the taxpayer subject to a net lease exceeds the rental income produced by such property for the taxable year.

. . . .

(2) **Carryover of disallowed investment interest.**—The amount of disallowed investment for any taxable year shall be treated as investment interest paid or accrued in the succeeding taxable year.

(3) **Definitions.**—For purposes of this subsection—

by the initials "I.R.C."

(A) **Net investment income.**—The term "net investment income" means the excess of investment income over investment expenses. If the taxpayer has investment interest for the taxable year to which this subsection (as in effect before the Tax Reform Act of 1976) applies, the amount of the net investment income taken into account under this subsection shall be the amount of such income (determined without regard to this sentence) multiplied by a fraction the numerator of which is the excess of the investment interest for the taxable year over the investment interest to which such prior provision applies, and the denominator of which is the investment interest for the taxable year.

(B) **Investment income.**—The term "investment income" means—

(i) the gross income from interest, dividends, rents and royalties,

(ii) the net short-term capital gain attributable to the disposition of property held for investment, and

(iii) any amount treated under sections 1245, 1250, and 1254 as ordinary income,

but only to the extent such income, gain, and amounts are not derived from the conduct of a trade or business.

(C) **Investment expenses.**—The term "investment expenses" means the deductions allowable under sections 162, 164(a)(1) or (2), 166, 167, 171, 212, or 611 directly connected with the production of investment income. For purposes of this subparagraph, the deduction allowable under section 167 with respect to any property may be treated as the amount which would have been allowable had the taxpayer depreciated the property under the straight line method for each taxable year of its useful life for which the taxpayer has held the property, and the deduction allowable under section 611 with respect to any property may be treated as the amount which would have been allowable had the taxpayer determined the deduction under section 611 without regard to section 613 for each taxable year for which the taxpayer has held the property.

(D) **Investment interest.**—The term "investment interest" means interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment.

26 U.S.C.A. § 163(d) (West 1978).

In effect, I.R.C. § 163(d) limits the amount of investment interest an individual may deduct in any given taxable year to $10,000 plus the amount of net investment income received in that year. Investment interest is defined as "interest paid or accrued on indebtedness incurred or continued to purchase or carry property held for investment." I.R.C. § 163(d)(3)(D). Assuming, arguendo, that C.H. purchased bank stock for investment purposes, I.R.C. § 163(d)(1)(A) and (B) limits the amount of the debtors' deduction.

I.R.C. § 163(d) sprang from the congressional recognition of a perceived abuse which arose whenever interest was incurred to obtain or maintain an investment asset. Before enactment of I.R.C. § 163(d), with its limitation on interest deduction, an individual could incur a sizeable interest expense on funds utilized to buy investment assets. That individual could then deduct such expense despite the fact that present income from the asset might be minimal. Where the interest expense exceeded current income from the asset, the interest expense could be used to shelter non-investment income from taxation. *See* H. Rep. No. 91–413, 1969 U.S.Code Cong. & Admin.News 1645, 1718–1719.

This court's task has been simplified by the recent Supreme Court decision in *Arkansas Best Corp. v. Commissioner of Internal Revenue*, 485 U.S. 212, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988). Speaking through Justice Marshall, the Supreme Court in *Arkansas Best* held that a taxpayer's motivation when purchasing an asset is irrelevant to the determination of whether or not the asset is a "capital asset" as

defined in I.R.C. § 1221.[12]

Arkansas Best, a diversified holding company, acquired approximately 65% of the stock in a Texas bank. Upon a sale of the bulk of the bank's stock, Arkansas Best claimed the resulting loss as an ordinary loss on its federal income tax return. The IRS, disagreeing with petitioner's characterization of the loss, disallowed the deduction, finding that the loss was actually a capital loss. The Supreme Court agreed. As a result, Arkansas Best's loss was subject to the capital loss limitation of I.R.C. § 1211(a).[13]

A consideration of the Court's analysis in *Arkansas Best* is dispositive of the question of § 163(d)'s applicability to the issues raised by the Trustee's objection.

*Arkansas Best* can be best understood through an examination of the Supreme Court's earlier decision in *Corn Products Refining Co. v. Commissioner of Internal Revenue*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955) and its progeny. In *Corn Products*, the petitioner suffered from severe shortages of raw corn, a raw material vital to its manufacturing process. To assure itself a stable supply, the petitioner entered the futures market in raw corn. When the petitioner sold futures contracts, it claimed the profits as capital assets. The IRS disagreed, contending that profits should be treated as ordinary income. *Id.* 350 U.S. at 48–50, 76 S.Ct. at 22–23.

In concluding that profits on the resale of futures contracts were taxable as ordinary income, Justice Clark, speaking for the Court, stated:

We find nothing in this record to support the contention that Corn Products' futures activity was separate and apart from its manufacturing operation. On the contrary, it appears that the transactions were vitally important to the company's business as a form of insurance against increases in the price of raw corn. Not only were the purchases initiated for just this reason, but the petitioner's sales policy, selling in the future at a fixed price or less, continued to leave it exceedingly vulnerable to rises in the price of corn. Further, the purchase of corn futures assured the company a source of supply which was admittedly cheaper than constructing additional storage facilities for raw corn. Under these facts it is difficult to imagine a program more closely geared to a company's manufacturing enterprise or more important to its successful operation.

350 U.S. at 50, 76 S.Ct. at 23.

The Court also noted:

Congress intended that profits and losses arising from the every day operation of a business be considered as ordinary income or loss rather than capital gain or loss.

350 U.S. at 52, 76 S.Ct. at 24.

Though futures contracts in raw corn did not strictly fall within any statutory exception to the definition of a capital asset, the Court determined that these futures contracts were the equivalent of inventory which was (and is under current § 1221) an exception to the definition of a "capital asset." [14] 350 U.S. at 51–52, 76 S.Ct. at 24; *See generally Continental Illinois National Bank & Trust Company of Chicago v. Commissioner of Internal Revenue*, 69 T.C. 357 (1977).

As a result of *Corn Products*, courts were confronted with the need to charac-

---

**12.** I.R.C. § 1221 provides in material part:

**Capital asset defined**

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer ... or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business[.]

26 U.S.C.A. § 1221 (West 1988) (unchanged since 1977).

Four additional exceptions enumerated in I.R.C. § 1221 need not be considered within the ambit of this Memorandum.

**13.** I.R.C. § 1211(a) provides: "[I]n the case of a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of gains from such sales or exchanges." 26 U.S.C.A. § 1211(a) (West 1988).

**14.** *See* n. 12, *supra*.

terize the gain or loss realized upon the sale of an asset as "ordinary" or "capital." They engaged in fact-intensive inquiries to determine if the asset was acquired and sold for ordinary business purposes as opposed to investment purposes. Whether the asset was acquired with a business or an investment motive determined the treatment of the gain or loss. *See generally Continental Illinois,* 69 T.C. 357; *Booth Newspapers, Inc. v. United States,* 303 F.2d 916, 157 Ct.Cl. 886 (1962); *W.W. Windle Co. v. Commissioner of Internal Revenue,* 65 T.C. 694 (1976), appeal dismissed 550 F.2d 43 (1st Cir.1977), *cert. denied,* 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977).

The Tax Court in *Continental Illinois,* examining the evolution of the *Corn Products* doctrine, noted:

> The *Corn Products* doctrine has exhibited an omnidirectional resilience productive of an endless stream of litigation over essentially factual issues. The Court of Claims recently observed that "*Corn Products* has been applied in lower courts in a variety of situations which possibly might surprise the *Corn Products* court." *Agway Inc. v. United States,* 207 Ct.Cl. 682, 524 F.2d 1194, 1200 (1975).

69 T.C. at 374.

In *W.W. Windle Co. v. Commissioner of Internal Revenue,* 65 T.C. 694 (1976), the plaintiff, a wool processor, established a corporation whose function was to purchase the plaintiff's wool for processing at the corporation's textile mill. The court found that the plaintiff's motive for purchasing a dominant ownership interest in the corporation combined both business and investment motives. The difficulties inherent in the factual analysis required under *Corn Products* was clearly enunciated by the *W.W. Windle* court:

> When both investment and business motives exist but the business motive predominates, does the predominant business motive determine the nature of the asset in the taxpayer's hands? Or ... does the presence of an investment motive, albeit secondary, override the business motive for acquiring the stock?

65 T.C. at 711–12.

The Tax Court in *W.W. Windle* held:

> As we move from inventory-related corn futures to a more traditional form of capital asset, such as stock, we should be more reluctant to be innovative in further broadening the domain of subjective analysis and unpredictability. Accordingly, we hold that *where a substantial investment motive exists in a predominantly business-motivated acquisition of corporate stock, such stock is a capital asset.*

65 T.C. at 713 (emphasis added).

In *Arkansas Best,* discussed *supra,* the petitioner Arkansas Best conceded that the bank stock it sold came within the literal meaning of "capital asset" under I.R.C. § 1221. It contended, however, that a literal reading of the statute was insufficient. It argued, rather, that the motive behind its acquisition of the bank stock must be considered. *Arkansas Best,* 108 S.Ct. at 974. The Supreme Court disagreed with the petitioner's argument for a "motive test," and stated:

> This motive test ... is not only nowhere mentioned in § 1221, but it is also in direct conflict with the parenthetical phrase "whether or not connected with his trade or business." [15] The broad definition of the term "capital asset" explicitly makes irrelevant any consideration of the property's connection with the taxpayer's business, whereas petitioner's rule would make this factor dispositive.

108 S.Ct. at 974 (footnote omitted).

The Supreme Court in *Arkansas Best* specifically limited application of the doctrine enunciated in *Corn Products* to "hedging transactions that are an integral part of a business' inventory-purchase system...." *Arkansas Best,* 108 S.Ct. at 977. In expressing its concern that a motive test such as that urged by the petitioner would lead to abuses, the Court stated:

> [I]f capital stock purchased and held for a business purpose is an ordinary asset,

---

**15.** *See* n. 12, *supra.*

whereas the same stock purchased and held with an investment motive is a capital asset, a taxpayer ... could have significant influence over whether the asset would receive capital or ordinary treatment. Because stock is most naturally viewed as a capital asset, the Internal Revenue Service would be hard pressed to challenge a taxpayer's claim that stock was acquired as an investment, and that a gain arising from the sale of such stock was therefore a capital gain. Indeed, we are unaware of a single decision that has applied the business-motive test so as to require a taxpayer to report a gain from the sale of stock as an ordinary gain. If the same stock is sold at a loss, however, the taxpayer may be able to garner ordinary-loss treatment by emphasizing the business purpose behind the stock's acquisition.

108 S.Ct. at 977.

Speaking directly to the nature of capital stock as well as to the appropriate treatment of a loss resulting from its sale, the Court stated:

> We conclude that a taxpayer's motivation in purchasing an asset is irrelevant to the question whether the asset is "property held by a taxpayer (whether or not connected with his business)" and is thus within § 1221's general definition of "capital asset." Because the capital stock held by petitioner falls within the broad definition of the term "capital asset" in § 1221 and is outside the classes of property excluded from capital-asset status, the loss arising from the sale of the stock is a capital loss. *Corn Products Refining Co. v. Commissioner, supra,* which we interpret as involving a broad reading of the inventory exclusion of § 1221, has no application in the present context.

108 S.Ct. at 978.

Commenting upon *Arkansas Best,* the district court in *Barnes Group, Inc. v.*

*United States of America,* 697 F.Supp. 591 (U.S.D.C.D.Conn.1988), vacated and remanded on other grounds 872 F.2d 528 (2d Cir.1989), observed:

> The *Arkansas Best* Court's clear directive to trial courts is that the taxpayer's motive for entering the transaction giving rise to the disputed gain or loss is entirely irrelevant unless that motive establishes the asset in question as a surrogate for one of the statutory exceptions to capital-asset treatment.

*Id.* at 597, n. 7. *See generally In the Matter of Larson,* 862 F.2d 112 (7th Cir. 1988).

■ *Arkansas Best's* relevance to the instant proceeding is obvious. The debtors claimed the payment of one hundred (100%) percent of the interest on loans incurred to provide funds necessary for the acquisition of bank stock as a business expense. In reliance upon I.R.C. § 163(d), the IRS disallowed the deductions claimed on Schedule C to the debtors' 1977, 1978 and 1979 income tax returns for the interest payments made on these loans. I.R.C. § 163(d) limits the amount of deductible interest where that interest was incurred for investment purposes. *Arkansas Best* mandates the treatment of bank stock, such as that purchased by C.H., as a capital asset for tax purposes. Therefore, I.R.C. § 163(d) limits the amount of investment interest which can be properly deducted by the debtors for the three tax years in question.

Additionally, the debtor's treatment of gains from sale of the bank stocks calls into question the Trustee's position. Even though the Trustee contends C.H. was in the trade or business of banking and the debtors deducted interest expense as a business expense, the debtors reported all gains from the sale of the bank stock as capital gains, thus availing themselves of capital gains deductions.[16] The Trustee's positions are inconsistent.

---

**16.** On a schedule attached to Schedule D—*Capital Gains and Losses* for the 1977 tax year, the debtors reported a long-term capital gain on the sale of bank stock and other transactions in the approximate amount of $1,587,611. On a schedule attached to Schedule D of the debtors' 1978 joint return, the debtors reported a long-term capital gain from the sale of bank stocks and a small number of other investments in the amount of $164,972.04. For the tax year 1979, the debtors reported a long-term capital gain on Schedule D from the sale of bank stock of

Following the Supreme Court's directives in *Arkansas Best*, this court's course of action is fixed. The IRS correctly applied I.R.C. § 163(d) in disallowing interest expenses and classifying income claimed on the debtors' joint income tax returns for the three tax years in question. The Trustee's objections on this ground must be denied.

## ISSUE NO. (2)

### Partnership Losses

In 1977 and 1978, C.H. held a 75% ownership interest in the Nashville Trust partnership which owned stock in Hamilton Bank of Nashville. Partnership expenses, specifically interest expenses incident to the ownership of the Hamilton Bank stock, were passed through to C.H. as a partnership loss. The debtors reported the interest expenses and the Nashville Trust partnership losses on Schedule C as trade or business expenses. The IRS determined the partnership to be investment losses. The Trustee contends that the partnership losses were trade or business losses.

For reasons discussed *supra* (relative to C.H.'s status as an investor or as one engaged in a trade or business), the IRS properly determined that the losses from the partnership are investment losses.

## ISSUE NO. (3)

### Investment Income

█ The IRS, upon examining the debtors' tax returns for the three years in question, reclassified fees and commissions reported by C.H. on Schedule C as income from a trade or business, to ordinary income. The IRS allowed all dividends listed on Schedule C of the debtors' returns.

In potential contradiction to his arguments relating to the bank stocks, the Trustee has previously contended that the fees and commissions should be allowed as investment income and not as ordinary in-come. In his trial brief, however, the Trustee hardly addresses this issue.

I.R.C. § 163(d)(3)(B) provides:

(B) **Investment income.**—the term "investment income" means—

 (i) the gross income from interest, dividends, rents, and royalties,

 (ii) the net short-term capital gain attributable to the disposition of property held for investment, and

 (iii) any amount treated under sections 1245, 1250, and 1254 as ordinary income,

but only to the extent such income, gain, and amounts are not derived from the conduct of a trade or business.

26 U.S.C.A. § 163(d)(3)(B) (West 1978).

The unambiguous language of the statute evinces a clear intent by Congress that only a limited class of items qualify as investment income. It is axiomatic that the plain meaning of a statute controls the court's interpretation of that statute. *See Escondido Mutual Water Company v. La Jolla Band of Mission Indians*, 466 U.S. 765, 104 S.Ct. 2105, 80 L.Ed.2d 753, *reh'g denied*, 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864 (1984). I.R.C. § 163(d)(3)(B) clearly defines "investment income" and, by exclusion, that which is not "investment income." The Trustee does not contend that fees and commissions earned by C.H. are interest, rents or royalties. I.R.C. § 163(d)(3)(B)(i). The Trustee would have considerable difficulty maintaining that the fees and commissions fall under the rubric of subsection (ii) of § 163(d)(3)(B) in light of his arguments contending that C.H.'s bank stocks were held primarily for business and not investment purposes. The Trustee does not argue the applicability of subsection § 163(d)(3)(B)(iii) to this matter.

The fees and commissions reported by the debtors on Schedule C do not fit within any of the investment income categories set forth in I.R.C. § 163(d)(3)(B). The IRS properly reclassified the fees and commissions reported on Schedule C as ordinary income.

approximately $409,659. Similarly, short-term capital gains and losses were reported on the sale of bank stocks for tax years 1977–78. The

debtors did not report any short-term capital gain or loss from the sale of bank stock for the 1979 tax year.

## ISSUE NO. (4)

### Entitlement of IRS Claims To Priority Status

At the request of the parties, resolution of this issue has been reserved pending further order of the court. *See* n. 5, *supra.*

## ISSUE NO. (5)

### Application of Innocent Spouse Exception

The Trustee asserts that Shirley's estate should be relieved of liability from the tax obligations imposed against the debtors under their 1977, 1978, and 1979 returns because Shirley meets the requirements necessary for application of the "innocent spouse" exception.

I.R.C. § 6013 provides in material part:

**§ 6013. Joint returns of income tax by husband and wife**

. . . .

(e) **Spouse relieved of liability in certain cases.—**

(1) **In general.**—Under regulations prescribed by the Secretary, if—

(A) a joint return has been made under this section for a taxable year.

(B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse.

(C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

(D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

(2) **Grossly erroneous items.**—For purposes of this subsection, the term "grossly erroneous items" means, with respect to any spouse—

(A) any item of gross income attributable to such spouse which is omitted from gross income, and

(B) any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in fact or law.

(3) **Substantial understatement.**—For purposes of this subsection, the term "substantial understatement" means any understatement (as defined in section 6661(b)(2)(A)) which exceeds $500.

(4) **Understatement must exceed specified percentage of spouse's income.—**

(A) **Adjusted gross income of $20,-000 or less.**—If the spouse's adjusted gross income for the preadjustment year is $20,000 or less, this subsection shall apply only if the liability described in paragraph (1) is greater than 10 percent of such adjusted gross income.

(B) **Adjusted gross income of more than $20,000.**—If the spouse's adjusted gross income for the preadjustment year is more than $20,000, subparagraph (A) shall be applied by substituting "25 percent" for "10 percent".

26 U.S.C.A. § 6013(e) (West Supp.1988).[17]

The Sixth Circuit has stated "that the taxpayer has the burden of proof with respect to all requirements of section 6013(e)." *Purcell v. Commissioner of Internal Revenue,* 826 F.2d 470, 473 (6th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1290, 99 L.Ed.2d 500 (following *Shea*

**17.** The current "innocent spouse" provision was enacted as part of the Deficit Reduction Act of 1984, Pub.L. 98–369, Section 424(a). Section 424(c) of the Deficit Reduction Act rendered the amendments to I.R.C. § 6013(a) applicable to all taxable years to which the Internal Revenue Code of 1954 applied. Therefore, § 6013(a), as currently enacted, governs the 1977, 1978 and 1979 tax years at issue in the instant proceeding. *Purcell v. Commissioner of Internal Revenue,* 826 F.2d 470, 473, n. 2 (6th Cir.1987); *See Shea v. Commissioner of Internal Revenue,* 780 F.2d 561, 564–565 (6th Cir.1986).

*v. Commissioner of Internal Revenue*, 780 F.2d 561, 565 (6th Cir.1986)).

Shirley must establish four requirements to qualify as an "innocent spouse" under I.R.C. § 6013(e): (1) The tax return in question must be a joint return; (2) the return must contain substantial understatements attributable to "grossly erroneous items" of C.H.; (3) the petitioner must establish that she did not know, and had no reason to know, of the substantial understatements; and (4) the petitioner must demonstrate that it would be inequitable, under all the facts and circumstances, to hold her liable for the tax deficiencies.

■ It is undisputed that the three tax returns in question are joint returns. As to the second element, I.R.C. § 6013(e)(2) defines "grossly erroneous items" to encompass "any claim of a deduction ... in an amount for which there is no basis in fact or law." It is this requirement, the IRS contends, that the Trustee cannot establish. The court agrees.

The Sixth Circuit in *Purcell* addressed the second requirement of I.R.C. § 6013(e)—"grossly erroneous items." In *Purcell*, the taxpayers claimed non-business bad debt deductions with respect to a closely-held corporation in which they each held a 25% ownership interest. The Sixth Circuit denied innocent spouse relief to Mrs. Purcell finding that the taxpayers' attempt to deduct their non-business bad debts had "both an arguable factual and legal basis for claiming them...." *Id.* at 476. The court upheld "the tax court's conclusion that [the taxpayer] had failed to meet her burden of proving that the deductions had no basis in fact or law...." 826 F.2d at 476.

Analyzing "grossly erroneous items," the tax court in *Douglas v. Commissioner of Internal Revenue*, 86 T.C. 758 (1986), stated:

> [A] deduction has no basis in fact when the expense for which the deduction is claimed was never ... made. A deduction has no basis in law when the expense, even if made, does not qualify as

a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility. Ordinarily, a deduction having no basis in fact or in law can be described as frivolous, fraudulent, or, to use the word of the [House Comm. on Ways and Means] report, phony.

86 T.C. at 762–763 (footnote omitted).

In the matter before the court, there are both factual and legal bases supporting the deductions claimed by the debtors. The debtors paid the interest expense which they deducted on Schedule C. Though the deduction was improperly claimed, there has been no assertion by the Trustee that the interest expense was not paid or that it is phony or fraudulent. By the same token, the debtors had a legal basis upon which to anchor their deduction for the interest expense. *See* discussion of *Corn Products Refining Co. v. Commissioner of Internal Revenue*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), discussed *supra.*

The Trustee has not met the burden of proof required to qualify Shirley as an "innocent spouse" under § 6013(e).

## CONCLUSION

For the reasons set forth herein, the Trustee's objections to the claims filed by the IRS in the above cases will be denied, provided, however, that a determination of the issue of whether the IRS claims are entitled, in whole or in part, to priority status under 11 U.S.C.A. § 507(a)(7)(A) (West Supp.1989) [18] is reserved pending further order of the court.

An appropriate order will be entered.

---

**18.** *See* n. 4, *supra.*