**BARNES GROUP, INC.**

v.

**UNITED STATES of America.**

**Civ. No. H–84–1008(MJB).**

United States District Court,
D. Connecticut.

Aug. 29, 1988.

Everett E. Newton, John C. Yavis, Jr., H. Kennedy Hudner, Murtha, Cullina, Richter & Pinney, Hartford, Conn., for plaintiff.

Leslie Ohta, Asst. U.S. Atty., New Haven, Conn., Jerome A. Busch, Terri E. Schapiro, Tax Div., U.S. Dept. of Justice, Deborah S. Meland, Joseph Cammarata, U.S. Dept. of Justice, Washington, D.C., for defendant.

BLUMENFELD, Senior District Judge.

## I. Introduction

This suit was brought by a corporate taxpayer, Barnes Group, Inc. ("Barnes"), seeking to recover deficiencies paid with respect to certain deductions disallowed by the Internal Revenue Service ("the government") for the 1978 and 1979 tax years. The dispute involves the tax treatment of two entirely separate series of transactions entered into by Barnes. In the first series of transactions Barnes acquired all of the stock of three corporations, and then immediately liquidated the companies. The government contests the tax bases and resulting depreciation deductions claimed by Barnes for certain assets alleged to have been received from the acquired corporations. In the second series of transactions Barnes entered into a contract to sell Swedish kronor, expecting a devaluation in the currency. Months later, when the currency unexpectedly *appreciated* in value, they entered into an offsetting contract to buy kronor. Barnes asserts that a portion of the loss incurred in these transactions deserves ordinary rather than capital loss treatment. The government argues that the entire loss was capital in nature.

Barnes' refund suit was scheduled for a jury trial in April of this year. The government, however, filed a motion *in limine* seeking exclusion of evidence upon which the taxpayer intended to rely to justify its tax treatment of assets acquired in the first series of transactions mentioned above. The court granted the motion after hearing arguments of counsel. Instead of proceeding to trial in the wake of the court's ruling, the parties agreed to attempt a stipulation of the essential facts and to submit cross motions for summary judgment. The court now considers those motions in light of its earlier ruling on the government's motion *in limine*.

## II. The Corporate Acquisitions

### A. *Facts*

In 1978 and 1979 Barnes acquired and liquidated three corporations, Globe Industries, Inc., the Chanenson Corporation, and Pioneer Products, Inc. The acquired companies were similar in structure prior to their acquisition by Barnes in that all three were closely held corporations in which major shareholders were also the most integral employees.

The transactions through which Barnes acquired and liquidated the companies were also similar. In each case Barnes executed stock purchase agreements with the company's shareholders and immediately liquidated the company upon acquisition of its stock. As a condition of each sale Barnes required the selling company to enter em-

ployment contracts, including covenants not to compete, with key employees. In each case these agreements, however, were specifically conditioned upon the sale of the company to Barnes, and in the event that no such sale took place the agreements were to have no effect. Barnes did not agree with the selling shareholders to allocate any specific portion of the purchase price paid for the stock of each acquired company to these conditional employment contracts or the covenants not to compete contained within them.

The parties agree that each of the acquired companies was immediately liquidated upon acquisition pursuant to section 332 of the Internal Revenue Code as it was then in effect. They agree further that the tax basis of the property received from the acquired companies is governed by the provisions of section 334(b)(2) as then in effect. Section 334(b)(2), and the accompanying regulations, provide that an acquiring company's adjusted basis in the stock of the liquidated company is to be allocated among the acquired assets, tangible and intangible, net of cash and cash equivalents, to determine the tax basis of those assets acquired that are depreciable or amortizable. In order to accomplish this allocation the plaintiff had all of the assets of each acquired corporation appraised. The first two such appraisals were conducted by the American Appraisal Company; the final appraisal was conducted in house, but employing the same valuation techniques used in the earlier independent appraisals.

The adjusted stock bases to be allocated among the assets received are not disputed, nor are the adjusted appraisal values ascribed to most of the acquired assets.[1] The government, however, did dispute the substantial value attributed by the appraisers to the conditional employment contracts, including the covenants not to compete. Instead of treating the contracts as separately valuable, depreciable assets the government placed the amounts attributed by the taxpayer to the contracts into the

general category of goodwill and going concern value. Additionally, the government rejected the stepped-up tax bases that Barnes' section 334(b)(2) allocation had ascribed to inventory, accounts receivable, and prepaid expenses. Instead, the government attributed values to those assets equal to their putatively realizable cash worth.

The government disallowed the depreciation deductions on the employment contracts, inventory, accounts receivable and prepaid expenses of the three acquired corporations that Barnes had claimed in tax years 1978 and 1979 to the extent that the tax bases of these assets as calculated by Barnes and its appraisers exceeded the government's own calculations as described above. Barnes paid the deficiencies assessed and sued in this court for a refund.

## B. *Discussion*

### 1. The Employment Contracts

■ The question concerning the appropriate tax treatment of the employment contracts, including the covenants not to compete, was exhaustively argued in open court by both parties in the context of the government's motion *in limine* on the eve of the scheduled trial. Because the court ruled upon the government's motion *in limine* as one for partial summary judgment on this crucial issue, and because the ramifications of that ruling for other issues to be decided are significant, the subject of the employment contracts, and the court's reasoning, warrant discussion here.

According to the unconditional representations of the plaintiff's counsel all of the employment contracts in question were explicitly conditioned upon the sale of the employer-company to Barnes. These employees were not bound by any contracts of employment with their former employer prior to the sale of each company to Barnes. Thus, in the event no sale had taken place the employees who signed contracts would have been free to resign from employment and to compete with their for-

[1]. Certain assets were not appraised for section 334(b)(2) allocation purposes, because their book value was deemed to equal their market value. These valuations are also undisputed.

mer employer. These documents were without legal effect until the moment Barnes purchased the stock of the employer-company. Since Barnes concedes that liquidation of the acquired companies immediately followed acquisition, the contracts cannot be said to have ever truly existed as assets of the acquired companies. It was entirely inappropriate, thus, for Barnes to have included the contracts in the allocation of its adjusted basis in the stock of the acquired companies pursuant to section 334(b)(2), and equally inappropriate to have claimed depreciation deductions based upon the tax bases erroneously ascribed to them.[2]

Besides the illusory nature of the employment contracts as alleged assets of the acquired corporations, an additional fact regarding these transactions prevents Barnes from legitimately depreciating the contracts. At oral argument on the government's motion *in limine* counsel for the plaintiff conceded that in addition to the monies paid to the selling shareholders to acquire stock in the purchased companies (a portion of which the plaintiff seeks to depreciate as attributable to the value of the employment contracts) Barnes also paid these same employees salaries under the contracts themselves. These latter amounts Barnes deducted as business expenses. While the legitimacy of the salary expense deductions is not to be doubted, to allow Barnes also to depreciate what it claims to be the value of those contracts would be to allow a double deduction for a single item of value.[3] This attempted treatment must clearly be disallowed as a matter of law.

### 2. Proper Tax Treatment of the Assets Actually Received

■ The taxpayer argues that if the employment contracts (including the covenants not to compete) are to be treated as having no value as assets of the acquired corporations then it is entitled to reallocate the amounts it had attributed to the contracts proportionately among the assets that the parties agree *were* actually acquired from the liquidated companies. The government, not surprisingly, objects to stepping-up the basis in the undisputed assets with a portion of the value Barnes had erroneously attributed to the employment contracts. It argues instead that these amounts should appropriately be ascribed to the goodwill and going concern value of the acquired corporations—assets which

---

2. Counsel for the plaintiff took exception at oral argument to the court's characterization of the employment contracts as a "device" for tax avoidance. While the court does not have any reason to question counsel's emphatic insistence that Barnes genuinely wanted these specific employees to remain in its employ following the liquidation of their former companies, the obvious intended tax consequences of these deals are also not to be ignored. In the ordinary situation the parties to stock sales such as these will agree on one amount as payment for the company to be sold and a separate amount to cover any future services (or agreements not to compete) by the selling shareholders. *See Ullman v. Commissioner,* 264 F.2d 305 (2d Cir. 1959). Such arrangements result in advantageous capital gains treatment for the price paid to the selling shareholders for their company, but disadvantageous ordinary income treatment for the amounts paid for their services. This in turn leads the shareholders to demand greater remuneration from their buyer. By failing to agree on an allocation of any separate value to the employment contracts Barnes clearly hoped to leave the selling shareholders in a position to treat *all* the money they received as subject to capital gains treatment, thereby leading to a lower acquisition price for Barnes. Barnes hoped unilaterally to allocate to the employment contracts a portion of the money paid for the companies, and then to depreciate these amounts. Thus, regardless of the sincerity of Barnes' desire to keep the valued employees after liquidation, the intentionally ambiguous manner in which the deals were structured may fairly be termed a "device" for tax avoidance.

3. The government approaches the double deduction problem from a slightly different, but nonetheless harmonious, perspective. It contends that Barnes might indeed be entitled to claim a depreciation deduction for the employment contracts, in addition to writing off the salary expense, but only to the extent that it was able to prove that a hypothetical employer in its situation would have paid more to hypothetical employees with the same job skills and experience as the employees that Barnes in fact hired. Since Barnes has made no claim, nor offered any proof, that the employees were worth more than it agreed to pay them, to allow any depreciation deduction for the contracts would be to allow a double deduction.

are not depreciable.[4] The court agrees with the government.

The government is correct in pointing out that the tax consequences of the apportionment urged by the plaintiff are at odds with the substance of the court's earlier ruling on the government's motion *in limine*. If the plaintiff were indeed permitted to distribute the amounts attributed for tax purposes to the fictional employment contract "assets" among the non-fictional assets, pursuant to Treas.Reg. § 1.334–1(c)(4)(viii), the result would be higher than market value tax bases for all the remaining depreciable assets. Consequently much of the very same impermissible tax benefit that the court earlier disallowed in ruling that the employment contracts were not assets of the acquired corporations would return by the back door in the form of economically unrealistic depreciation deductions for the assets that were in fact acquired. Such an outcome, besides representing an end run around the court's previous ruling, would also constitute an untenable elevation of form over substance. *See Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945) ("To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of tax policies of Congress").

The government's position, that the value erroneously ascribed to the fictional employment contract "assets" properly belongs under the category of non-depreciable corporate goodwill, finds considerable support in the relevant case law. Under the so-called "residual" method of valuing intangible assets such as goodwill the value of the intangibles in question is arrived at simply by "subtracting the value of the tangible assets from the total purchase price." *Concord Control, Inc. v. Commis-*

*sioner*, 78 T.C. 742, 745 (1982). Because both the price Barnes paid for the acquired companies and the market values of the tangible assets thus acquired have been stipulated by the parties, the residual method of valuing goodwill is both practicable and appropriate. *See Banc One Corp. v. Commissioner*, 84 T.C. 476, 508 (1985) (residual valuation method appropriate rather than capitalization method which would result in stepping-up basis of tangible assets over their market value). Applying the residual method it is clear that the value erroneously attributed to the employment contracts is properly credited to intangible and non-depreciable goodwill.[5]

### III. The Foreign Currency Contracts

#### A. *Facts*

During 1978 and 1979 Barnes owned all of the stock of a Swedish spring manufacturer, Stece, A.B. ("Stece"). Prior to 1978 there had been significant devaluations of the Swedish krona, causing American parent companies owning Swedish subsidiaries to show paper losses on their domestic financial statements when their Swedish holdings were translated from Swedish kronor into American dollars.

Anticipating further devaluations in the krona Barnes decided, in February of 1978, to enter a contract to sell 13,900,000 kronor to Continental Illinois National Bank & Trust Company ("Continental") approximately one year in the future. If the devaluation of the krona had occurred as Barnes projected, the taxpayer could have purchased the kronor it needed to fulfill the contract at a price below that which Continental had agreed to pay. The gain on the transaction would then have offset the paper loss on Barnes' Swedish holdings that would also have resulted from the anticipated devaluation.

Contrary to Barnes' expectations, the krona *increased* in value relative to the dollar between February of 1978 and Feb-

---

**4.** Neither party has distinguished, for the purposes of these cross motions, between the closely allied concepts of goodwill and going concern value.

**5.** Because the court finds that the value Barnes had ascribed to the employment contracts is

appropriately treated as non-depreciable corporate goodwill, the issue of whether all tangible assets are eligible for an unlimited step-up in basis pursuant to Treas.Reg. § 1.334–1(c)(4)(viii) is not reached, as there is no excess purchase price to be allocated.

ruary of 1979. Barnes entered a contract with Continental to purchase back the same amount of kronor that it had previously agreed to sell. The price at which Barnes agreed to purchase exceeded the price at which Continental had agreed to buy by $296,417.50, which resulted in a loss to Barnes of this amount when the exchange transactions were eventually closed by way of a compensation agreement offsetting the two contracts.

The dispute between Barnes and the government with respect to the above described transaction relates not to the amount of Barnes' loss, but to its character. The taxpayer wants the loss treated as an ordinary loss to the extent that a gain on the sale of its stock in Stece would have been treated as an ordinary gain at the time Barnes entered the contract to sell kronor. The government contends the entire loss is capital in nature.

### B. *Discussion*

Barnes' theory regarding the character of the loss incurred as a result of the foreign currency exchange contracts flows from the purpose for which it engaged in those transactions, rather than from the nature of the assets that were the subject of the transactions. Barnes argues that since its undisputed objective in entering the original currency sale contract was to offset anticipated paper losses resulting from its ownership of Stece's stock in the event of further krona devaluations, the character of the loss should be the same as the character of its interest in the Stece stock. Since a sale of the Stece stock at the time of the currency sale contract would have yielded ordinary income for Barnes to the extent of Stece's accumulated earnings during Barnes' tenure of ownership, Barnes contends that a commensurate proportion of its loss on the currency

exchange transactions deserves ordinary loss treatment.

Barnes cites no statutory authority for its contention that the purpose of the currency exchange transactions determines the character of the loss incurred. Instead it relies upon case law to support its view, principally the case of *Hoover Co. v. Commissioner*, 72 T.C. 206 (1979). In *Hoover* the tax court, on facts indistinguishable for the present purposes from those of the instant case, held, as the taxpayer urges here, that a loss from a currency exchange transaction intended to offset a currency devaluation paper loss in the value of a foreign subsidiary had to receive the same tax treatment as would a gain or loss on the parent company's interest in the subsidiary. *Id.* at 237.

*Hoover*, however, as well as the other cases cited by the plaintiff in support of its position, must be examined in the light of the Supreme Court's latest pronouncement concerning the characterization of gains and losses on the sale of property. In *Arkansas Best Corp. v. Commissioner*, — U.S. —, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988), a unanimous Court put an abrupt end to judicial elaboration upon the statutorily enunciated categories of property entitled to ordinary gain or loss treatment. The high court pointed out that section 1221 of the Internal Revenue Code defines as a capital asset all property that is not the subject of a specific statutory exclusion,[6] without "any consideration of the property's connection with the taxpayer's business." *Id.* 108 S.Ct. at 974. Accordingly, the Court held that an inquiry into the taxpayer's motivation with respect to the acquisition of the asset giving rise to the disputed gain or loss was generally irrelevant in determining whether that gain or loss was capital or ordinary in nature. *Id.*

---

**6.** The classes of property exempt from capital-asset treatment under I.R.C. § 1221 at the time of the transactions in question were: (1) property of a kind which would properly be included in the inventory of the taxpayer; (2) real property or other depreciable property used in the taxpayer's trade or business; (3) a copyright, a literary, musical, or artistic composition, or similar property; (4) accounts or notes acquired in the ordinary course of trade or business for services rendered or from the sale of inventory; and (5) certain federal and state debt obligations.

In order to reach the above conclusion the Court in *Arkansas Best* had to explain its earlier decision in *Corn Products Refining Co. v. Commissioner*, 350 U.S. 46, 76 S.Ct. 20, 100 L.Ed. 29 (1955), which had given rise to an increasingly complex collection of judicial glosses on the statutory scheme for characterizing gains or losses as capital or ordinary. In *Corn Products* the Court had held that corn futures contracts acquired by a producer of corn products were "an integral part of its business designed to protect its manufacturing operations against a price increase in its principal raw material and to assure a ready supply for future manufacturing requirements." *Id.* at 50, 76 S.Ct. at 23. In *Arkansas Best* the Court made clear that the only reason why the taxpayer's purpose in engaging in corn futures trading was relevant in determining whether the gains or losses thus incurred were capital or ordinary in nature was that it established the futures contracts as "surrogates for the stored inventory of raw corn." *Id.* 108 S.Ct. at 977. Since the company's raw corn inventory fell within one of the statutorily enumerated exceptions to capital gain or loss treatment, so should the futures transactions that were merely a surrogate for this inventory. *Id.*

Barnes does not argue that its currency exchange transactions were a surrogate for any of the types of property statutorily exempted from capital-asset treatment. Hence any inquiry into the taxpayer's purpose in entering the transactions is irrelevant under *Arkansas Best.*[7] Since no claim is made that the currency contracts qualified directly for a statutory exemption from capital-asset treatment, the court must conclude, following *Arkansas Best,* that the loss incurred was entirely capital in nature.

## IV. Conclusion

In the case of both the series of transactions giving rise to the instant refund suit the position of the government must be sustained and the taxpayer's position rejected. Barnes improperly considered the employment contracts with key employees of the companies it acquired as depreciable assets of those companies, when in fact the contracts had no legal effect until the moment when the acquired companies ceased legal existence. The taxpayer cannot be allowed to ·avoid the tax consequences of the court's ruling in this regard by simply reallocating the value it had erroneously attributed to the contracts so as to increase the tax bases of the depreciable assets that *were* received above their market value. Barnes has also failed to show that the currency exchange contracts that it entered fell within any statutory exemption from capital-asset tax treatment, and thus the loss it incurred through those transactions must be considered completely capital in nature. Accordingly the government's motion for summary judgment is granted, and the taxpayer's is denied.

SO ORDERED.

7. Barnes' attempt to distinguish *Arkansas Best* from the instant case on the ground that that case did not involve a hedging transaction to protect the value of an ordinary income asset is unavailing. The *Arkansas Best* Court's clear directive to trial courts is that the taxpayer's motive for entering the transaction giving rise to the disputed gain or loss is entirely irrelevant unless that motive establishes the asset in question as a surrogate for one of the statutory exceptions to capital-asset treatment.

The court is mindful of the problem, noted by Barnes, that the Supreme Court's holding in *Arkansas Best* creates for the tax treatment of hedging transactions to protect the value of ordinary income assets. That problem, in view of the clear language of section 1221 and the strict interpretation the Supreme Court has now given it, is apparently one that will have to await a legislative solution, as the taxpayer points out has recently occurred with respect to the tax treatment of hedging transactions in other contexts. *See, e.g.,* I.R.C. § 1256(e).