T.C. Memo. 1997-246


UNITED STATES TAX COURT


NEW ORLEANS LOUISIANA SAINTS, LIMITED PARTNERSHIP, BENSON
FOOTBALL, INC., TAX MATTERS PARTNER, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2632-94.                    Filed June 2, 1997.


Douglas D. Drysdale, Trevor W. Swett III, and Matthew W.
Frank, for petitioner.

Derek B. Matta, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

WRIGHT, Judge: Respondent issued five notices of final

partnership administrative adjustments to petitioner, determining

adjustments for taxable years 1985 through 1989. After

concessions by the parties, the sole issue for consideration is

whether any portion of the amount petitioner paid for the purchase of the New Orleans Saints football franchise is allocable to a leasehold which grants petitioner certain rights in the Superdome, located in New Orleans, Louisiana. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect during the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

Petitioner, a Texas corporation owned by Thomas H. Benson, Jr. (Benson), is the general partner of a Texas limited partnership known as the New Orleans Louisiana Saints Limited Partnership (the partnership). The partnership was formed April 23, 1985, and its address and principal place of business is in Metairie, Louisiana. Since the partnership's inception, petitioner has been responsible for controlling the management of the partnership's affairs. During the years at issue, the partnership was an accrual basis taxpayer and operated with a December 31 fiscal yearend. The partnership timely filed its Federal information tax returns for each taxable year at issue.

The Saints Football Team

The New Orleans Saints (interchangeably the Saints and the team) is a professional football team and has been an official member of the National Football League (NFL) since 1967. Since its formation, the team's home city has been New Orleans, Louisiana. The team failed to experience a winning season during

its first 20 years in the NFL.  Its first winning season occurred in 1987.  From 1967 through 1974, the Saints played their home games at a stadium owned by Tulane University (the Tulane stadium).  The Tulane stadium is located in New Orleans.  During that period, the Tulane stadium had an approximate seating capacity of 81,000 for football games.  The Saints drew an average attendance per home game of approximately 70,966 while using the Tulane stadium.  In 1975, the Saints began playing their home games at the New Orleans, Louisiana, Superdome (the Superdome).  From 1975 through 1984, the Saints drew an average attendance per home game of approximately 55,000.  During the 5-year period immediately preceding petitioner's acquisition of the Saints, the number of tickets sold for preseason and regular season home games was as follows:

| Year | Tickets Sold |
|------|--------------|
| 1980 | 548,026 |
| 1981 | 639,890 |
| 1982 | 378,397[1] |
| 1983 | 674,066 |
| 1984 | 639,470 |

Until May 31, 1985, the Saints were owned by a Louisiana partnership in which John W. Mecom, Jr., (Mecom) was a general partner and the principal investor  (collectively, the Mecom Group).  Mecom purchased the Saints franchise agreement from the

---

[1]There was a 2-month player-strike during the 1982 NFL season.  Because the Saints played fewer home games, fewer tickets were sold.

NFL for approximately $8.5 million.  On May 31, 1985, petitioner acquired control of the Saints by the purchase of certain assets and the assumption of certain liabilities and obligations of the Mecom Group.  The partnership paid the Mecom Group $70,494,789 for the Saints.

The Superdome

The Superdome is an indoor stadium located in downtown New Orleans.  It is owned by the Louisiana Stadium and Exposition District (LSED), a body politic and corporate and political subdivision of the State of Louisiana (occasionally the State). The LSED was created in 1966 by amendment to the Louisiana Constitution for the purpose of planning, financing, constructing, and operating the Superdome.  At all relevant times, the Superdome has been managed by Facility Management of Louisiana, Inc. (FML), a corporation owned and controlled, directly or indirectly, by the A.N. Pritzger family of Chicago, Illinois (Pritzger).  Pritzger also owned or controlled, directly or indirectly, the Hyatt Hotel chain, including the Hyatt Hotel adjacent to the Superdome.

Construction of the Superdome was authorized by a constitutional amendment passed by Louisiana voters in 1966. Actual construction began in 1971 and the Superdome opened in August 1975.  The structure was financed by LSED through three private bond issues totaling $137.5 million and by a 4-percent lodging tax levied on hotel and motel rooms located within LSED's

geographical boundaries. The Superdome is a 27-story arena capped by a dome that is 680 feet in diameter. As of May 31, 1985, it housed a complete television broadcast facility, a closed circuit television system, four ballrooms, a stadium club, two restaurants, two cocktail lounges, a gift shop, 64 box suites (increased to 132 in 1987), and parking garages sufficient for 5,000 automobiles and 250 buses. The stadium, garages, and grounds occupy 52 acres situated in the vicinity of many major hotels and less than a mile from the French Quarter of New Orleans.

The Superdome is well suited to host a large variety of activities. Over the years, it has provided a forum for football, baseball, and basketball exhibitions, as well as concerts, festivals, conventions, trade shows, and other various meetings. Seating capacity varies and depends on the activity. Regular seating for football games is approximately 70,000, but this can be expanded to approximately 76,800 by adjusting the stadium's movable stands.

Since its construction, the Superdome has been the site of many prominent sporting events, including the NCAA Basketball Championships in 1982 and 1987, and the annual college Sugar Bowl Football Classic. The NFL's Super Bowl has been played there five times since 1978.

The Stadium Leases

From 1967 through 1974, the Mecom group rented the Tulane stadium for use by the Saints. From 1967 through 1969, the Saints paid rent to Tulane University for each home game under this arrangement at the rate of 12 percent of total net receipts derived from all concessions sales, except programs and copyrighted items.[2] On June 23, 1975, the Mecom Group entered into a lease with the State and LSED for the use of the Superdome (the 1975 Lease). At all times subsequent to the effective date of the 1975 Lease, the Saints have been the Superdome's anchor tenant. The 1975 Lease was for a primary term of 10 years and commenced on August 9, 1975. It contained a provision permitting the Mecom Group to extend the primary term of the lease for two successive 5-year periods. The terms of the renewal provision required that the Mecom Group give appropriate notice of its intent to exercise each option to extend the lease not less than 120 days before the expiring primary or extended term. Article 4, of the 1975 Lease required the Mecom Group to pay rent equal to the greater of $25,000 or 10 percent of gross ticket sales per game, plus $2,000 per home game for utilities, plus the cost of hiring game-day personnel for clean-up and crowd control, and to perform technical and miscellaneous functions.

---

[2]The record does not contain information regarding the Saints' payment arrangement with Tulane University for the 1970 through 1974 football seasons.

The 1975 Lease granted the Mecom Group exclusive use and occupancy of the Superdome for each day on which a Saints home game (home game) was scheduled to be played in the Superdome. It also granted the team access to the playing field during specified hours on the day before each home game and exclusive and continuous possession of an equipment and training room in the Superdome from 1 week prior to the Saints' first home game until 1 week after the team's last home game for each year of the lease. Under the 1975 Lease, the Mecom Group was not entitled to share in any of the receipts from stadium advertising, concessions, parking, box suites, or other stadium sources. All of the revenues were retained by LSED. The 1975 Lease was amended in 1976 to address an issue concerning the seating configuration in the Superdome.

On February 22, 1984, LSED entered into a lease with the New Orleans Breakers (the Breakers), a member of the former United States Football League (USFL) to use the Superdome for football games. This lease required the Breakers to pay a base rent for each home game played in the Superdome equal to the greater of $20,000 or 7 percent of gross ticket sales after taxes, plus 1 percent of all gross revenues received by the Breakers in respect of television broadcasts or rebroadcasts of any USFL games, plus the cost of various services. This lease, which became effective on July 6, 1984, allegedly violated the exclusivity provisions contained in the 1975 Lease.

In July 1984, the Mecom Group and LSED executed a second amendment to the 1975 Lease (the Second Lease Amendment). This amendment was in response to the alleged contractual breach that occurred when LSED entered its lease with the Breakers. In exchange for relinquishing its breach of contract claim against LSED and the State, the Mecom Group received a reduction in its rental terms under the 1975 Lease. The Second Lease Amendment reduced the rent payable by the Mecom Group for the Saints' use of the Superdome to the greater of $25,000 per game or 5 percent of gross ticket sales, and provided that all costs and expenses of providing utilities and day-of-game staff are part of the consideration for the rent paid by the Mecom Group. According to petitioner's calculations, the improved rental terms generated an annual saving of approximately $730,000.

The NFL and Public Financial Assistance

In 1985, the NFL consisted of 28 teams and was the focal point of professional football. The USFL's attempt to establish itself as a reputable professional football league had failed and that league was in its final year of existence. By this time, municipalities across the country had begun to appreciate that substantial economic incentives were associated with hosting a professional football franchise and demand for those teams out paced their supply. Despite this notable disparity, the NFL was reluctant to expand and that reluctance fostered a competitive environment among localities interested in attracting an NFL team

to their communities.  The increasing demand for professional football teams gave rise to an increasing willingness on behalf of State and local governments to provide public sector financial assistance to team owners.  That is, in order to attract a professional football team to their communities, State and municipal governments were becoming more willing to contribute large amounts of financial assistance to team owners.  Financial assistance was commonly conveyed through subsidized stadium leases underwritten by the public sector.

Stimulated by the competition to secure and retain professional sports teams, State and municipal governments entered the stadium facility business and began offering those facilities and related benefits as inducements to team owners. These inducements took various forms, including:  (1) The construction, renovation, or expansion of stadiums at the expense of the public sector; (2) public sector financing of luxury suites, stadium clubs, and other forms of premium seating the revenues of which could be assigned to the resident team; and (3) the assignment to the resident team of the right to operate or profit from cash-generating functions of the stadiums, such as parking garages and concessions and souvenir stands.  Inducements of this nature were particularly valuable to team owners because of the growth of stadium revenues and the preferred treatment accorded stadium revenues and related assets under the NFL's revenue-sharing rules and team debt limitations.

During the years at issue, the NFL revenue sharing program applied to gross revenues derived from national broadcasting rights and ticket sales, the two major sources of revenue for each team.  All broadcasting of regular and post-season games was carried out under the terms of periodic league-wide contracts. The revenues from the broadcasting were shared equally among all NFL teams.  Revenues derived from ticket sales were also shared, but on a different basis.  Generally, the home team received 60 percent of ticket revenues, plus an additional 15 percent for expenses, and the visiting team was entitled to the balance.

By 1985, stadium operations provided a third potential revenue source for NFL teams.  These included revenues from luxury suites, advertising, parking, concessions, novelty sales, promotional allowances, and similar payments.  The NFL's revenue sharing rules, however, did not apply to revenues generated from stadium operations.  Consequently, if structured appropriately, a team's stadium lease could be converted from an expense item to a source of revenue.

Economic Impact of the Saints

At all relevant times during the years at issue, tourism and entertainment have been among the leading industries in the City of New Orleans (occasionally the City or New Orleans) and the State of Louisiana.  Moreover, because of the team's ability to attract fans and stimulate local business, the Saints have been one of several important elements in that industry.

The Sale of the Saints

Mecom decided to sell the Saints after a disappointing 1984 football season.  He established a sale price of $75 million for the team and subsequently engaged the services of Thomas E. Thompson (Thompson), Gary Jones, Gus Blackshire, Jack Allendar, and Bill Becknell, as well as certain other individuals (collectively Mecom's negotiating team), in order to attain his desired selling price.  Mecom derived the sale price without assistance of an appraisal evaluation or other expert advice regarding the fair market value of the Saints.  Similarly, he did not consider or plan for the tax consequences associated with the sale of the team.

Despite having had no prior business experience with professional football, Thompson was the chief negotiator among the members of Mecom's negotiating team.  Thompson initially thought that Mecom's asking price of $75 million was excessive because the Saints had a poor financial record and recent reports indicated that the fair market value of the Saints ranged between $40 and $45 million.  Thompson's concerns, however, were eventually dispelled, and he became convinced that the price was reasonable.  Facilitating the change in Thompson's point of view was the prospect of public sector financing.  More specifically, Thompson came to view the impending expiration of the initial term of the 1975 Lease as a viable tool that could be used to generate interest among cities and States interested in luring

the Saints away from New Orleans. Consequently, Thompson believed that the potential departure of the Saints from Louisiana would cause the City of New Orleans and the State of Louisiana to propose generous financial assistance in order to retain the Saints. To this end, Thompson adopted a strategy designed to exploit the earnings potential of the Superdome. In its simplest terms, Thompson's plan was to threaten to move or sell the Saints for relocation unless the City and the State agreed to provide an interested buyer public sector financial support in the neighborhood of $20 to $25 million.

Consistent with Thompson's strategy, the Mecom Group held discussions with various parties interested in acquiring the Saints and relocating the team to another city. Proposals were entertained from groups in various cities, including Baltimore, Maryland; Phoenix, Arizona; and Jacksonville, Florida. Pritzger and Benson also expressed interest in acquiring the Saints. Unlike the proposals from Baltimore, Phoenix, and Jacksonville, however, Pritzger and Benson both were interested in keeping the Saints in New Orleans. About this time, reports began surfacing in Louisiana that the Saints might be sold and moved to another State.

In late 1984, the Mecom Group began negotiating to sell the Saints to a company controlled by Pritzger. In order to approach Mecom's asking price of $75 million, Pritzger offered to pay between $40 and $45 million for the Saints and asked the State to

contribute an additional $20 to $25 million. After weeks of negotiation, Pritzger signed a letter of intent to buy the Saints but conditioned the purchase on the receipt of an assistance package from the State.

Beginning in late 1984, Louisiana's State Government began to seriously consider the potential ramifications of losing the Saints to another State. Louisiana's Governor Edwin Edwards (Governor Edwards) believed that the loss of the Saints would be catastrophic to the City of New Orleans and the State of Louisiana. On or about February 1, 1985, Governor Edwards publicly announced that Pritzger had signed a tentative purchase agreement to buy the Saints from Mecom contingent on an unspecified amount of State aid.

On February 4, 1985, Governor Edwards addressed members of the State Legislature and informed them of both Mecom's desired selling price of $75 million and Pritzger's offer of $45 million. He then proposed a means for bridging the gap between these two figures. His proposal entailed (1) an appropriation of $25 million, either in cash from the State's general fund or through a bond sale; (2) a declaration converting the Superdome to a tax exempt political subdivision; (3) a bond sale to construct a conference training center on land to be leased to the Pritzgers by the State for a minimal fee; and, (4) a 30-year extension of the contract between the State and the Pritzger interests for the management of the Superdome.

Governor Edwards' proposal was not well received by members of the Legislature. The principal concern involved the $25 million "front-end" appropriation. Negotiations between Mecom and Pritzger ultimately reached an impasse.

On February 18, 1985, Benson announced that he was negotiating with the Mecom Group to acquire the Saints. On or about March 8, 1985, Benson and the Mecom Group executed a sales contract (the Sales Contract) with respect to the sale of the team. Section 5.02 of the Sales Contract conditioned petitioner's obligation as buyer on the State's prior execution of a lease or a further amendment to the 1975 Lease containing specified provisions. The required provisions included, among other things, (a) assignment to the buyer of all revenue derived by the State and the City from parking and sale of concessions at the Superdome; (b) assignment to the buyer by the State of all revenues derived from box suites; and, (c) the agreement of the State and the City to exempt all transactions occurring in the Superdome from any and all sales, amusement, and use taxes.[3] It was estimated that these concessions, consisting of both the tax exemptions and the assignment of revenues, would cost the City and the State between $7.8 and $8.4 million per year.

_____

[3]This tax exemption refers to the sales and amusement taxes totaling 14 percent theretofore imposed on Superdome revenues. The State's portion of this was 4 percent; the remaining 10 percent was split among the City (7.5 percent), the Regional Transit Authority (1 percent), and the Orleans Parish School District (1.5 percent).

Shortly after the Sales Contract was executed, Benson began lobbying the State Legislature to promote approval of the proposed lease inducements. The Mecom group also engaged a lobbyist for this purpose. Both parties were aware that Benson would be unable to acquire the Saints without first obtaining public sector support. Accordingly, both resolved to persuade the Legislature to approve the conditions set forth in the Sales Contract. Despite this collaborative effort, a resolution was introduced in the Louisiana House of Representatives on May 16, 1985, to impose a dollar limit on the total lease inducements to be provided by the State in the form of revenue derived from concessions, box suites, and parking. A similar resolution was introduced in the Louisiana Senate on May 22, 1985. Governor Edwards actively opposed both resolutions, and both were subsequently defeated.

Dissatisfied with the progress of negotiations and in light of the recent legislative resolutions imposing a limit on total lease inducements, Benson's representatives, in cooperation with the Mecom Group, subsequently prepared a memorandum entitled "The Saints Legislative Program" and presented it to the State Legislature. Among other things, the document stressed that the pending expiration of the 1975 Lease effected a substantial increase in the fair market value of the team due to the team's ability to relocate to another State. These efforts proved

successful and prompted the Legislature to urge Governor Edwards to execute the Revised Lease.

## The Sale of the Saints

On April 1, 1985, the State and the Mecom Group executed a third amendment to the 1975 Lease. This amendment extended to May 9, 1985, the deadline for the Mecom Group to exercise its first option to extend the term of the Superdome lease for 5 years. Similarly, in light of the ongoing negotiations, the State and the Mecom Group again amended the 1975 Lease on May 7, 1985, further extending to May 25, 1985, the deadline for the Mecom Group to exercise its option to extend the term of the Superdome lease. The deadline was again extended on May 23, 1985.

On May 23, 1985, the State and Benson executed a document entitled "Fifth Amendment to New Orleans Saints Superdome Stadium Lease" (the Revised Lease). As provided therein, the Revised Lease was intended to induce the Saints to maintain its domicile in the Superdome by granting certain inducements in the form of reduced rentals and the assignment of certain revenues. The assignment of those revenues, when combined with rental and tax savings, made the Revised Lease a source of positive annual net cash flow to the partnership. By amendment to Article 2 of the 1975 Lease, the Revised Lease extends the term of the Superdome lease by 21 years, to June 30, 2006. Similarly, by amendment to Article 7 of the 1975 Lease, the Revised Lease requires FML to

remit to the partnership on a monthly basis all rental receipts collected in the preceding month in respect of existing box suites.[4]  The Revised Lease, by amendment to Article 8 of the 1975 Lease, requires FML to pay the partnership on a monthly basis an amount equal to all receipts paid to FML in the preceding month with respect to sales of food, beverages, novelties, and other merchandise concessions sold in the Superdome during a Saints home game.  By further amendment to Article 8, the Revised Lease requires FML to remit to the partnership on a monthly basis an amount equal to the receipts collected in the preceding month in respect of any advertising at the Superdome.  The Revised Lease further amends Article 8 and requires FML to pay the partnership on a monthly basis an amount equal to gross receipts collected in the preceding month in respect of parking at the Superdome during the Saints' home games.  The Revised Lease also amends Article 8 and requires FML to remit to the partnership on a monthly basis an amount equal to FML's receipts collected in the preceding month in respect of dues and other membership fees paid by members of the Superdome's "Stadium Club," and receipts attributable to guided tours of the Superdome.  The Revised Lease also requires FML to pay the partnership on a monthly basis a sum equal to 50 percent of the

---

[4]This amendment also granted both FML and petitioner certain other rights with respect to box suites.

amount of FML's receipts for the preceding month from the "Superdome Marketing and Promotional Fund."

Pursuant to the terms of section K of the Revised Lease, the obligations of the parties thereto were to take effect only if and when (a) the partnership acquired "all of the right, title and interest of the New Orleans Saints Football Club in the Original Lease and in substantially all of [the team's] other assets," and (b) the parties "executed Amendments to extend or re-execute existing leases of office space and ticket offices in the Superdome" (administrative leases). On May 31, 1985, the partnership and the Mecom Group closed the sale of the Saints (the closing). On that same date, the Mecom Group and the partnership executed an Assignment of Leases, and the partnership executed a letter agreement with LSED and FML extending the Saints' existing administrative leases. If Benson had been unable to close on the sale of the team, the Mecom Group had no right, title, or interest to the Revised Lease.

Allocation of the Sales Price

Pursuant to sections 2.01 and 4.04 of the Sales Contract, the Mecom Group and petitioner allocated the price petitioner paid to acquire the Saints (often the acquisition price) among the assets sold to petitioner. To this end, they adopted a preliminary allocation, but agreed that a final allocation would await the results of a formal appraisal. In the preliminary allocation, the Mecom Group and Benson allocated $6.1 million to

the Superdome leasehold and $10 million to the nonamortizable NFL franchise.[5]

After the closing, petitioner engaged the services of American Appraisal Associates, Inc. (AAA), for the purposes of conducting an independent appraisal of specified tangible and intangible assets associated with the purchase of the team. Among the tangible assets appraised were furniture, machinery and equipment, uniforms and supplies, camera equipment, game films, and vehicles. Among the intangible assets appraised were rights to player contracts, an assembled work force of nonplayer personnel, software, broadcasting and rebroadcasting agreements, the leasehold interest in the Superdome, and the NFL franchise. The AAA appraisal valued the Saints' leasehold interest in the Superdome at $21 million.

The Mecom Group generally agreed with the AAA appraisal except as to the value allocated to the Superdome leasehold. Eventually, the Mecom Group and petitioner agreed to allocate $16 million to the Superdome leasehold.

Giving effect to adjustments, and including assumed liabilities, the contracting parties later determined that the acquisition price under the Sales Contract was $70,494,789. To

---

[5]The term "Superdome leasehold" refers to petitioner's leasehold interest in the Superdome without distinction between the 1975 Lease and the Revised Lease. The term is used interchangeably with the phrase "petitioner's leasehold interest in the Superdome."

finance its acquisition of the Saints, petitioner relied upon capital contributions of $20 million, a $29 million loan from Allied Bank of Texas (Allied), and a $10 million loan from the Mecom Group. Petitioner also assumed $11,264,129 in liabilities and contributed approximately $231,000 from other sources. Separate and apart from any consideration paid to the Mecom Group, petitioner incurred acquisition expenses of $252,189 with respect to its Superdome leasehold.

Stipulated Premises

For purpose of this case, the parties have stipulated that the appropriate method of allocating the acquisition price is the residual method, as illustrated by section 1.1060-1T(d), Temporary Income Tax Regs., 53 Fed. Reg. 20739 (July 18, 1988). With respect to the residual method, the sole class IV asset is the Saints' NFL franchise. Of the total acquisition price, the parties have agreed to allocate $46,132,780 to assets other than leases and the NFL franchise. Hence, the amount of the acquisition price remaining to be allocated is $24,362,009. The parties have further stipulated that if any amount is to be allocated to the Superdome leasehold, that amount will be $16 million.

OPINION

This case involves the acquisition of a professional football team and its accompanying assets, both tangible and intangible. At issue is whether petitioner, having purchased the

team and its assets, is entitled to allocate a portion of the acquisition price to its leasehold interest in the Superdome. The parties have stipulated that petitioner's leasehold interest is an intangible asset that is used in petitioner's business and in the production of income. They have also agreed that the leasehold has a limited useful life corresponding to the term established by the Revised Lease. Additionally, the parties have stipulated that if any portion of the acquisition price is allocable to the Superdome leasehold, the amount so allocable will be $16 million. Accordingly, we must decide whether petitioner is entitled to allocate any portion of the price it paid to acquire the Saints to its Superdome leasehold.

Petitioner advances two arguments in its attempt to refute respondent's determination. Petitioner's principal argument is that the Revised Lease, because of what petitioner characterizes as "mutual conditionality" between the Sales Contract and the Revised Lease, was an asset among those acquired from the Mecom Group, and that a portion of the acquisition price is therefore allocable to the Superdome leasehold.

Petitioner also argues that irrespective of whether the Revised Lease is construed as being an asset among those received from the Mecom Group, the 1975 Lease, which was the lease actually transferred to petitioner, had value immediately prior to the formation of the Revised Lease, and that it is to that

value that petitioner has allocated a portion of the acquisition price.

Respondent agrees with neither of petitioner's contentions. Instead, respondent argues that petitioner cannot allocate a portion of the acquisition price to the Superdome leasehold because the Revised Lease was not an asset obtained from the Mecom Group. Respondent also contends that the allocation lacks economic reality and was arbitrarily assigned for the purpose of achieving favorable tax consequences. Moreover, with respect to petitioner's alternative argument, respondent maintains that the 1975 Lease was without substantial value and fails to qualify as a premium lease. We find petitioner's alternative argument persuasive.

Section 1012 sets forth the general rule that the basis of property shall be the cost of such property. Additionally, section 1060 sets forth special allocation rules for determining a transferee's basis in certain asset acquisitions. Section 1060 was added to the Internal Revenue Code in 1986, Tax Reform Act of 1986, Pub. L. 99-514, sec. 641(a), 100 Stat. 2085, 2282, and was made effective for any acquisition of assets after May 6, 1986. The parties have agreed to allocate the acquisition price in accordance with the "residual method," as described in sec. 1.1060-1T(d)(2), Temporary Income Tax Regs., 53 Fed. Reg. 27040 (July 18, 1988).

Under section 1060, assets are divided into four classes. Class I assets consist of cash, demand deposits, and like accounts in banks, savings and loan associations, and other depository institutions. Class II assets consist of certificates of deposit, Federal securities, readily marketable stock and securities, and foreign currency. Class IV assets are intangible assets in the nature of goodwill and going-concern value. Class III assets are all assets that are not class I, class II , or class IV assets, including accounts receivable, equipment, buildings, land, and covenants not to compete. Sec. 1.1060-1T(a)(1), (b)(1), (d), Temporary Income Tax Regs., 53 Fed. Reg. 27039-27040 (July 18, 1988). The total consideration is allocated to class I assets in an amount equal to each asset's face value. The remaining consideration is then allocated to class II assets in proportion to the fair market value of each class II asset. The remaining consideration is then allocated to class III assets in an amount equal to the fair market value of each class III asset. Any residue is allocated to class IV assets. Sec. 1.1060-1T(d), Temporary Income Tax Regs.

The 1975 Lease is a class III asset. Sec. 1.1060-1T(d), Temporary Income Tax Regs. Moreover, the parties have stipulated that the sole class IV asset consists of the team's NFL franchise. Hence, the NFL franchise is the sole residual asset.

It is well settled that "the cost of acquiring a * * * [lease] is a capital expenditure, recoverable through

amortization over the remaining life of the lease." Steinway & Sons v. Commissioner, 46 T.C. 375, 381 (1966); sec. 1.162-11(a), Income Tax Regs. It is clear, however, that the taxpayer must have incurred some cost, by an outlay of consideration, as a necessary prerequisite to the allowance of the deductions. A leasehold is an intangible asset that is gradually exhausted by the passage of time. Its cost is recoverable ratably by way of amortization deductions over the period of exhaustion in the same manner that costs of tangible assets are recoverable by way of depreciation deductions. Of course, the amortization deductions are in addition to those for rent required to be paid under the lease. See Washington Package Store, Inc. v. Commissioner, T.C. Memo. 1964-294.

We turn now to petitioner's principal argument that a portion of the acquisition price is allocable to the Superdome leasehold due to what petitioner refers to as "mutual conditionality" between section 5.02 of the Sales Contract and section K of the Revised Lease. Petitioner argues that the "operative instruments [the Sales Contract and the Revised Lease] wove the enhanced stadium lease into the fabric of the sale." And, as such, petitioner further argues that it "was not liable for the purchase price unless it received the Revised Lease, and was entitled to the Revised Lease only if it paid the purchase price." Accordingly, petitioner's argument concludes, the conditions set forth in section 5.02 of the Sales Contract and

section K of the Revised Lease "leave no doubt that the [acquisition] price is attributable in part to the value of the Revised Lease."

Respondent's principal argument in this case is that petitioner cannot allocate a portion of the acquisition price to the Superdome leasehold because the Revised Lease was not obtained from the Mecom Group, but rather from the State of Louisiana for no consideration. As support for this argument, respondent relies on Barnes Group, Inc. v. United States, 697 F. Supp. 591 (D. Conn. 1988), vacated and remanded 872 F.2d 528 (2d Cir. 1989), reconsidered 724 F. Supp. 37 (D. Conn. 1989), affd. 902 F.2d 1114 (2d Cir. 1990). We agree with respondent.

The facts make it clear that, despite the interplay between the Sales Contract and the Revised Lease, petitioner obtained the Revised Lease from the State of Louisiana, not from the Mecom Group. To be sure, in establishing the terms of the Revised Lease, petitioner and the State negotiated virtually every term contained in the 1975 Lease. Furthermore, petitioner entered the Revised Lease in its own name. See Washington Package Store, Inc. v. Commissioner, T.C. Memo. 1964-294. The Mecom Group never possessed an interest in the Revised Lease, and it necessarily follows that petitioner could not have obtained the Revised Lease from the Mecom Group. Although it is couched in terms of an amendment to the 1975 Lease, the Revised Lease, as respondent contends, was in essence a new lease that petitioner obtained

from the State of Louisiana. Merely calling a new lease an amendment to an existing lease is not dispositive.

We turn now to petitioner's alternative argument. Petitioner argues that irrespective of whether the Revised Lease is construed as being an asset among those purchased from the Mecom Group, the 1975 Lease, which was the lease petitioner actually received from the Mecom Group, had substantial value separate and apart from the Revised Lease, and that it is to that value that petitioner has allocated a portion of the price it paid to acquire the Saints.

Respondent, on the contrary, maintains that the 1975 Lease was without substantial value and fails to qualify as a premium lease. Whether a lease qualifies as a premium lease requires an examination of the entire record. Thomas v. Commissioner, 31 T.C. 1009, 1012 (1959). Factors which are usually considered in determining the value of leasehold interests are: (1) The rental charged under the lease compared to the fair market value rental for the property, see KFOX, Inc. v. United States, 206 Ct. Cl. 143, 510 F.2d 1365 (1975); (2) the location of the property, see Harris Amusement Co. v. Commissioner, 15 B.T.A. 190 (1929); (3) the duration of the lease and any termination provision, see Bryden v. Commissioner, T.C. Memo. 1959-184; (4) the date of the most recent negotiations concerning the provisions of the lease, see May v. Commissioner, a Memorandum Opinion of this Court dated July 22, 1944; and (5) the arm's-length nature of the

negotiations, <u>Midler Court Realty, Inc. v. Commissioner</u>, 521 F.2d 767, 769 (3d Cir. 1975), affg. 61 T.C. 590 (1974); see <u>Metro Auto Auction of Kansas City, Inc. v. Commissioner</u>, T.C. Memo. 1984-440. While respondent maintains that we should consider each of these five factors, he addresses only the first factor in meaningful detail. His discussion of the remaining four factors is incomplete.

There is no question that a leasehold may have a value in the hands of the lessee when the fair rental value exceeds the rent established by the lease. See <u>KFOX, Inc. v. United States</u>, 510 F.2d at 1373-1374; <u>A.H. Woods Theater Co. v. Commissioner</u>, 12 B.T.A. 827 (1928). With respect to the first factor cited above, we find that the record contains ample evidence that the rent required by the 1975 Lease was considerably lower than the fair rental value of the Superdome. In July 1984, the Mecom Group and LSED executed the Second Lease Amendment in response to the alleged contractual breach that occurred when LSED executed a Superdome lease with the Breakers. The rent required under the 1975 Lease after the execution of the Second Lease Amendment was 50 percent less than the rent required under the lease immediately prior to that amendment. The Second Lease Amendment also eliminated the team's obligation to pay day-of-game expenses. Petitioner's calculations determine the total annual savings attributable to the Second Lease Amendment to be approximately $730,000. Evidence in the record also indicates

that the rent required by the terms of the Second Lease Amendment was markedly less than the rent required under the lease that LSED executed with the Breakers in February 1984, which preceded the execution of the Second Lease Amendment by a mere 5 months.

Respondent agrees that the terms of the 1975 Lease were more favorable to the Mecom Group after the Second Lease Amendment than before that amendment. Respondent maintains, however, that our evaluation of the fair market value of the 1975 Lease cannot be performed properly by simply comparing values of the lease before and after the Second Lease Amendment. Instead, according to respondent, a proper evaluation requires a comparison of the value of the 1975 Lease with the value of several proposed leases contained in bids entered by various cities interested in attracting the Saints away from New Orleans. Those cities include Phoenix, Arizona; Indianapolis, Indiana; Philadelphia, Pennsylvania; and Jacksonville, Florida. In other words, respondent maintains that the "market" to be considered when determining the fair rental value of the 1975 Lease must not be limited to the geographical boundaries of New Orleans. Instead, it is respondent's position that the "market" must include cities that had expressed interest in luring the Saints away from New Orleans. Respondent maintains that information contained in material that petitioner used in its lobbying effort indicates that the cities of Jacksonville, Phoenix, and Indianapolis offered free use of their stadiums in order to attract the Saints

to their respective cities.  Similarly, respondent explains that the city of Philadelphia offered to defer all stadium rental payments for a period of 10 years if the Saints agreed to relocate to Philadelphia.  Hence, according to respondent and in light of these proposed rental terms, the terms of the 1975 Lease after the Second Lease Amendment were not more favorable to the lessee than those of comparable stadium leases.

We are not persuaded by respondent's attempt to expand our focus with respect to the fair rental value of the 1975 Lease. Not only are the lease values advanced by respondent merely proposals, the record is insufficient for an analysis of the comparability of the facilities located in other cities.

Respondent also attempts to refute petitioner's argument by directing our attention to the duration of the period during which the benefits stemming from the terms of the Second Lease Amendment were realized by the Mecom Group.  Specifically, respondent maintains that the Mecom Group experienced little benefit from the terms of the Second Lease Amendment because that amendment preceded the sale of the team by 1 year.  Additionally, respondent maintains that had the Mecom Group been unable to sell the team, it would not have benefited from the terms of the Second Lease Amendment for a period exceeding 1 year unless it exercised its option to extend an otherwise unfavorable lease. This is so, respondent explains, because the Second Lease Amendment preceded the expiration of the primary term of the 1975

Lease by 1 year. According to respondent, the 1975 Lease was unfavorable because it lacked generous revenue incentives consistent with the industry trend.

We find respondent's argument unconvincing. By focusing on the duration of the benefit generated by the Second Lease Amendment, respondent is simply attempting to broaden our focus with respect to the evaluation of the 1975 Lease. As previously noted, we are not persuaded by respondent's attempt to convince us to consider proposed lease values contained in bids made by cities interested in attracting the Saints.

Under the second factor, we are to consider the location of the Superdome. Again, respondent seeks to define the "market" and expand the focus of our evaluation to include those cities that had expressed an interest in hosting the Saints. Petitioner, on the other hand, contends that we limit our focus to Louisiana, and specifically New Orleans. We are inclined to agree with petitioner. At issue here is the fair market value of the Superdome lease, and, as previously noted, the record does not support an analysis of the comparability of the Superdome and facilities located in other cities. The Superdome is located in New Orleans, and we restrict our focus accordingly.

Under the third factor, we consider the duration of the 1975 Lease. We recognize that the lease was due to expire prior to the start of the 1985 football season but note that the lease provided for two successive 5-year renewal options. In our view,

the presence of these renewal options favors petitioner's argument, and we find respondent's argument to the contrary unconvincing. The renewal options were not without value and, although the record does not identify the extent of their value, we are convinced that that value was not insubstantial, as respondent contends. The terms of the Second Lease Amendment reflected generous concessions made by the State, and the renewal options made it possible for the fruit of those concessions to be enjoyed by the Saints for up to 10 years.

The fourth factor entails an examination of the most recent negotiations concerning the provisions of the 1975 Lease. Prior to petitioner's acquisition of the team, the most recent negotiations between the Mecom Group and LSED occurred in mid-1984. These negotiations were in response to LSED's lease with the Breakers and gave rise to the Second Lease Amendment. Respondent maintains that we should discount these negotiations because they were the result of a contractual breach rather than a genuine interest on behalf of the State to provide an incentive to the team. We decline to do so. It is immaterial that the lease negotiations at issue came to pass simply because LSED desired to avoid a breach of contract claim. LSED was conscious of the available renewal options and was surely aware of the potential benefit it was bestowing on the Mecom Group through the enhanced terms of the Second Lease Amendment.

The final factor considers the arm's-length nature of the negotiations between the Mecom group and the State with respect to the Second Lease Amendment.  Again, respondent attempts to obscure matters by arguing that this factor favors his argument because the negotiations giving rise to the Second Lease Amendment stem from a breach of contract dispute rather than a genuine concern on behalf of the State.  We are unpersuaded by respondent's argument and find that the negotiations giving rise to the Second Lease Amendment were conducted at arm's-length.

Conclusion

Having analyzed the record in the instant case, and after examining the facts in extensive detail, we are of the opinion that the fair rental value of the Superdome exceeded the value of rent established by the 1975 Lease, as amended by the Second Lease Amendment.  See KFOX, Inc. v. United States, 510 F.2d at 1373-1374; A.H. Woods Theater Co. v. Commissioner, 12 B.T.A. 827 (1928).  We note that while petitioner has failed to establish the precise amount by which the fair rental value of the Superdome exceeded the value of the rent required by the amended lease, we are convinced that petitioner has sufficiently established that the former does in fact exceed the latter.  This is significant because the parties have stipulated that if any portion of the purchase price is allocable to the Superdome

leasehold, the amount so allocable will be $16 million.[6]  Because we have found that the 1975 Lease, being a class III asset as defined by section 1.1060-1T(d)(2), Temporary Income Tax Regs., 53 Fed. Reg. 20740 (July 18, 1988), was a premium lease, it follows that a portion of the price petitioner paid to acquire the Saints is allocable thereto.

The $16 million figure was the result of compromises by both sides and was agreed to with full knowledge of the relevant facts.  Accordingly, we shall give the stipulation binding effect in accordance with Rule 91(e), see Louisiana Land & Exploration Co. v. Commissioner, 90 T.C. 630, 648-649 (1988), and find that petitioner may allocate $16 million of the price it paid to acquire the Saints to its Superdome leasehold.

To reflect the foregoing,

Decision will be

entered under Rule 155.

---

[6]The specific language of the stipulation is as follows:

> If any portion of the purchase price paid by Petitioner for the Saints is properly allocable to the Superdome Lease, the amount so allocable is $16 million, as reported in Petitioner's federal income tax returns.

The stipulation defines the term "Superdome Lease" as "the 1975 Lease as amended from time to time."